IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHARLENE KLEIN,                         :
                                        :
                    Plaintiff,          :         CIVIL ACTION NO. 17-4507
                                        :
        v.                              :
                                        :
OFFICER STEPHEN MADISON,                :
OFFICER CHRISTOPHER HENDRICKS,          :
OFFICER MICHAEL GOOD, OFFICER           :
JACOBY GLENNY,  JOHN/JANE DOES          :
1-X, MAYOR EDWIN PAWLOWSKI,             :
FORMER CHIEF KEITH MORRIS, and          :
CITY OF ALLENTOWN,                      :
                                        :
                    Defendants.         :

## MEMORANDUM OPINION

Smith, J.                                                          April 10, 2019

        In the middle of the night on May 2, 2016, the plaintiff heard a knock at her door.

Answering the door in her pajamas, she found several City of Allentown police officers seeking

information about her son's whereabouts and requesting permission to search her home without a

warrant.  The plaintiff flatly refused and attempted to close her door and end the encounter.  What

happened next is disputed by the parties.  The plaintiff argues that two officers proceeded to

violently pull her from her doorway, throw her over a railing, handcuff her, and drag her to a police

car.  The defendants allege that the plaintiff violently slammed the door shut on an officer's hand,

then punched him in the face, and was restrained using a reasonable amount of force.  Regardless

of what occurred, it is undisputed that the encounter ended with a warrantless entry into her home

and in her arrest.

        The plaintiff brought the instant civil action against the officers who entered her home and

arrested her, the former chief of police, the former mayor of the City of Allentown, and the City

of Allentown. Concerning the asserted causes of action, she brings several 42 U.S.C. § 1983 claims and state law claims (*i.e.*, assault and battery, trespass, civil conspiracy) against the individual officers. Against the former police chief, she brings a claim for supervisory liability-policymaker liability under section 1983. Against the City of Allentown, she brings a section 1983 claim for municipal liability pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).

Currently before the court is the defendants' motion for summary judgment on all causes of action. The defendants request summary judgment on the basis that the plaintiff has (1) failed to establish her claims as a matter of law and (2) the officers, for certain of her claims, qualify for immunity under federal and state law. As to all her claims but one, which the court dismisses without prejudice pursuant to *Heck v. Humphrey*, 512 U.S. 477 (1994), and partial summary judgment for another, the court finds disputed issues of material fact preclude summary judgment in favor of the defendants. Therefore, for the reasons stated below, summary judgment is granted in part and denied in part.

## I.     PROCEDURAL HISTORY

The plaintiff, Charlene Klein, filed her complaint against the defendants, Officer Stephen Madison ("Officer Madison"), Officer Christopher Hendricks ("Officer Hendricks"), Officer Michael Good ("Officer Good"), Officer Jacoby Glenny ("Officer Glenny"), John/Jane Does 1-X ("Does"), (former) Mayor Edwin Pawlowski ("Mayor Pawlowski"), the (former) Chief of Police Keith Morris ("Chief Morris"), and the City of Allentown (the "City") on October 10, 2017. Doc. No. 1. The complaint asserted twelve causes of action:[1] (1) excessive force in violation of the

---

[1] The plaintiff also names fictitious defendants for each claim in the complaint. The parties ultimately dismissed any claims against the fictitious defendants by stipulation. *See* Doc. Nos. 94, 95. As such, the court omits reference to the fictitious defendants in describing the plaintiff's causes of action.

Fourth Amendment under section 1983 against Officers Madison, Hendricks, and Glenny, in their individual capacities; (2) unlawful search in violation of the Fourth Amendment under section 1983 against Officers Madison, Hendricks, Good, and Glenny (collectively, the "Officers") in their individual capacities; (3) failure to intervene in violation of the Fourth Amendment under section 1983 against the Officers in their individual capacities; (4) civil conspiracy under section 1983 against the Officers in their individual capacities; (5) denial of medical care in violation of the Fourteenth Amendment under section 1983 against the Officers in their individual capacities; (6) violation of her Fourteenth Amendment due process rights under section 1983 against the Officers in their individual capacities; (7) supervisory liability/policymaker liability under section 1983 against Mayor Pawlowski and Chief Morris in their individual capacities; (8) municipal liability pursuant to *Monell* against the City; (9) assault and battery under Pennsylvania law against Officers Madison, Hendricks, and Glenny in their individual capacities; (10) violations of the Pennsylvania Constitution against the Officers; (11) trespass under Pennsylvania law against the Officers in their individual capacities; and (12) civil conspiracy under Pennsylvania law against the Officers. Compl. at 26–66, Doc. No. 1.

The defendants filed an answer and affirmative defenses to the complaint on December 27, 2017. Doc. No. 13. After discovery concluded, the defendants moved for summary judgment as to all claims brought by the plaintiff on December 14, 2018. Doc. No. 55. On January 4, 2019, the plaintiff filed a response in opposition to the motion for summary judgment. Doc. No. 58. The court heard oral argument on the motion on January 9, 2019. *See* Doc. No. 60. The defendants then filed a reply brief and a separate response to plaintiff's additional facts on January 14, 2019. Doc. Nos. 62, 63. Lastly, the plaintiff filed a sur-reply brief as to certain issues raised during oral

argument on January 24, 2019. Doc. No. 68. On March 27, 2019, the parties dismissed the claims against the Does and Mayor Pawlowski by stipulation. Doc. No. 95.

The motion for summary judgment is ripe for disposition.

## II. DISCUSSION

### A. <u>Standard of Review – Motions for Summary Judgment</u>

A district court "shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Additionally, "[s]ummary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

The party moving for summary judgment has the initial burden "of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). Once the moving party has met this burden, the non-moving party must counter with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted); *see* Fed. R. Civ. P. 56(c) (stating that "[a] party

asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . .; or . . . [by] showing that the materials cited do not establish the absence . . . of a genuine dispute"). The non-movant must show more than the "mere existence of a scintilla of evidence" for elements on which the non-movant bears the burden of production. *Anderson*, 477 U.S. at 252. Bare assertions, conclusory allegations, or suspicions are insufficient to defeat summary judgment. *See Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982) (indicating that party opposing a motion for summary judgment may not "rely merely upon bare assertions, conclusory allegations or suspicions"); *Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172 F.3d 238, 252 (3d Cir. 1999) (explaining that "speculation and conclusory allegations" do not satisfy non-moving party's duty to "set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor"). Additionally, the non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Thus, it is not enough to "merely [] restat[e] the allegations" in the complaint; instead, the non-moving party must "point to concrete evidence in the record that supports each and every essential element of his case." *Jones v. Beard*, 145 F. App'x 743, 745–46 (3d Cir. 2005) (citing *Celotex*, 477 U.S. at 322). Moreover, arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109–10 (3d Cir. 1985).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d

180, 184 (3d Cir. 2007). The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and the court should grant summary judgment in favor of the moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted). Nonetheless, when one party's claims are "blatantly contradicted by the record, so that no reasonable jury could believe it," the court should not take those claims as true for the "purposes of ruling on a Motion for Summary Judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## B.     Undisputed Material Facts[2]

On May 2, 2016, at approximately 2:30 a.m., the Officers were dispatched to the area of 9th and Cedar Streets in Allentown to investigate a domestic disturbance. Statement of Undisputed Facts in Supp. of the Allentown Defs.' Mot. for Summ. J. ("Defs.' Facts") at ¶ 7, Doc. No. 56; Pl.'s Mem. of Law in Opp. to Defendants, City of Allentown, (Former) Mayor Edwin Pawlowski, (Former) Chief Keith A. Morris, Officer Stephen Madison, Officer Christopher Hendricks, Officer Michael Good, and Officer Jacoby Glenny's Mot. for Summ. J. ("Pl.'s Mem."), Ex. 1, Pl.'s Resp. to Defs.' Statement of Undisputed Facts ("Pl.'s Resp. to Defs.' Facts") at ¶ 7, Doc. No. 58-3. Officer Madison was the first to arrive at the scene, and he began to interview the victim who appeared "distraught, crying, and holding her head." Defs.' Facts at ¶ 8; Pl.'s Resp. to Defs.' Facts at ¶ 8. The victim informed Officer Madison that a man named Brandon Deher ("Brandon")

---

[2] Although the parties dispute most of the facts relating to the events on May 2, 2016, the court has construed the facts in the light most favorable to the plaintiff as she is the party opposing summary judgment. *See Green v. N.J. State Police*, 246 F. App'x 158, 159 (3d Cir. 2007) ("The parties dispute many of the relevant facts in this case. Because we are reviewing a summary judgment ruling, we must view the facts in the light most favorable to [the plaintiff], the party who opposed summary judgment.").

"physically assaulted her, removed her from the car, and dragged her across the concrete by her hair." Defs.' Facts at ¶ 10; Pl.'s Resp. to Defs.' Facts at ¶ 10. At this point, Officers Madison and Hendricks proceeded to interview two witnesses to the assault.[3] Defs.' Facts at ¶ 12; Pl.'s Resp. to Defs.' Facts at ¶ 12.

According to the defendants, witnesses informed several of the officers that Brandon lived at 830 North 9th Street (the "Residence") and that he ran up the alley towards his home. Defs.' Facts at ¶¶ 12–13; Pl.'s Resp. to Defs.' Facts at ¶¶ 12–13. Also according to the defendants, the victim informed the officers that Brandon ran into the home. Defs.' Facts at ¶¶ 12–13; Pl.'s Resp. to Defs.' Facts at ¶¶ 12–13. According to the plaintiff, the officers were never informed, at the time they approached the home, that Brandon was seen running into the house. *Compare*, Defs.' Facts at ¶ 13 ("The victim stated that Brandon assaulted her and fled into Plaintiff's home."), *with* Pl.'s Resp. to Defs.' Facts at ¶ 13 ("A genuine dispute exists. No witness told either Madison or Hendricks that the suspect 'fled towards the home through the alley.'").

Armed with the information above, Officer Madison and, ultimately, the other officers, walked up to the Residence in search of Brandon.[4] Defs.' Facts at ¶ 15; Pl.'s Resp. to Defs.' Facts at ¶ 15. The Residence is a "row house," and as such, it shares a divided porch with the adjoining home. Defs.' Facts, Ex. F, Dep. of Charlene D. Klein ("Klein Dep.") at 68, 92–93, 95–97, Doc. No. 56-6. The home also has both a solid front door and a "screen door" that opened outward.

---

[3] The parties dispute what the witnesses told Officers Madison and Hendricks, but not that there were two witnesses or that Officers Madison and Hendricks conducted interviews. *Compare* Defs.' Facts at ¶ 12 ("Two (2) witnesses on the scene reported that the individual who had assaulted the victim lived at the Plaintiff's home and had fled towards the home through the alley."), *with* Pl.'s Resp. to Defs.' Facts at ¶ 12 (stating that "[n]o witness told either Madison or Hendricks that the suspect 'fled towards the home through the alley[,]'" but citing to record evidence indicating that Officers Madison and Hendricks both interviewed witnesses on subject night).

[4] The parties dispute which Officers arrived initially at the house. *See* Pl.'s Resp. to Defs.' Facts at ¶ 15 ("A genuine dispute exists. It is contested that Officer Good proceeded to the Plaintiff's house and knocked on the door with Officers Madison and Glenny."). However, ultimately all four officers arrived at her home and were present during the incident with the plaintiff.

*See* Defs.' Facts at ¶ 19; Pl.'s Resp. to Defs.' Facts at ¶ 19; *see also* Klein Dep. at 91 (describing

door as "screen door"); Defs.' Facts, Ex. B, Dep. of Stephen Madison ("Madison Dep.") at 84 ("Q.

And the screen door – A. Opens outside."), Doc. No. 56-2.

Officer Madison then knocked on the front door of the Residence and the plaintiff answered

by opening the solid door.[5]  Defs.' Facts at ¶ 16; Pl.'s Resp. to Defs.' Facts at ¶ 16; *see* Madison

Dep. at 84 ("Q. All right.  So her coming to -- to the door, she would have had to open -- or did

she open the solid door?" A. "Her main door?  Yes.").  Officer Madison informed the plaintiff that

they were from the Allentown Police Department and were searching for her son, Brandon.  Defs.'

Facts at ¶ 16; Pl.'s Resp. to Defs.' Facts at ¶ 16.  The plaintiff informed the Officers that Brandon

was not at home and that she suspected he was at work.  Defs.' Facts at ¶ 17; Pl.'s Resp. to Defs.'

Facts at ¶ 17.  Officer Madison then asked the plaintiff if they could search her home for Brandon.

Defs.' Facts at ¶ 20; Pl.'s Resp. to Defs.' Facts at ¶ 20.  All parties agree that the plaintiff refused

to consent to the warrantless search.  Defs.' Facts at ¶ 21; Pl.'s Resp. to Defs.' Facts at ¶ 21.

It is undisputed that at this time, Officer Madison's hand was holding the screen door open.

*See* Defs.' Facts at ¶ 19; Pl.'s Resp. to Defs.' Facts at ¶ 19; *see also* Klein Dep. at 91 ("So in the

meantime, my door, the screen door, is jugged.  You know he [Officer Madison] had it in his

hand."); Madison Dep. at 75 ("I held the door to keep her from closing it.").  When the plaintiff

refused to allow the Officers into her home, she attempted to close the screen door and end the

encounter.[6]  *See* Defs.' Facts at ¶ 22 ("Plaintiff then proceeded to close the door on Officer

---

[5] It appears from the record that Officers Madison and Hendricks walked up onto the porch and Officers Glenny and Good remained nearby but did not walk onto the porch.  *See, e.g.*, Madison Dep. at 40 (describing Officer Good as standing "at the bottom of the -- steps watching it, you know, occur"); Defs.' Facts, Ex. C, Dep. of Jacoby Glenny ("Glenny Dep.") at 49 ("When I got there, there were officers on the porch of the Klein resident—residence speaking with Klein at the front door."), Doc. No. 56-3.

[6] It appears that after the plaintiff refused to allow the Officers into her home, Officer Madison proceeded to try and glean information about Brandon from the plaintiff.  *See* Madison Dep. at 83 ("Q. And when she said get an arrest warrant, you did not do anything to get an arrest warrant. Correct? A. Besides getting his name and date of birth or attempting to[?] Q. Right. A. Um-hm.").

Madison's hand while his hand was still holding the door."); Pl.'s Resp. to Defs.' Facts at ¶ 22 ("A genuine dispute exists. According to Madison, Klein had the right to close the screen door and not speak with him . . . .").[7]

The parties dispute what occurred next. According to the defendants, Officer Madison tried to free his hand from the door and then the plaintiff punched him in the face. *See* Madison Dep. at 75 ("She then took both of her hands and forcefully closed it shutting my hand in the door. From then, I ripped the door open to get my hand out. And I stepped forward and she punched me in the face."), 94 ("Well, after I removed -- forced the door open and removed my hand, I stepped forward and she punched me in the face."). This prompted Officers Madison and Hendricks to approach the plaintiff and attempt to "detain her." Defs.' Facts at ¶ 23; Pl.'s Resp. to Defs.' Facts at ¶ 23.

The plaintiff disputes that she ever punched Officer Madison. *See* Klein Dep. at 121 (Q. "And did you strike the officer?" A. "No."). According to the plaintiff, after she declined to allow the Officers to enter her home, Officer Hendricks said to Officer Madison, "[i]t's your call, Bud" and then Officer Madison "came into" her "doorway and yanked [her] out." *Id.* at 92. The plaintiff asserts that after Officer Madison removed her from the home, Officers Madison and Hendricks "jerked" her over the concrete barrier on the porch that divides the rowhouses. *Id.* at 92–93. The plaintiff indicates that she informed the Officers to be careful of her shoulder because her rotator cuff was "torn" and that they were hurting her. *Id.* at 92, 142. Once cuffed, she also states that she complained that the handcuffs were too tight and cutting off her circulation. *See id.* at 144

---

[7] The plaintiff does not respond to the defendant's factual assertion and instead makes legal arguments about the plaintiff's constitutional right to close her door. The court considers the fact undisputed because the parties do not appear to dispute that she attempted to close the door, but rather, whether she had such a right. *See* Pl.'s Mem. at 3 (stating that plaintiff "began to close the door" after declining to provide consent).

("Correct. And I'm telling them they were too tight. I couldn't even feel my hands. I couldn't do anything.").

After being placed in handcuffs, Officers Glenny and Madison placed the plaintiff in the back of Officer Madison's police car. Defs.' Facts at ¶ 23; Pl.'s Resp. to Defs.' Facts at ¶ 23; Klein Dep. at 146; *see* Madison Dep. at 128 (describing the plaintiff as being "placed in the rear side of my -- my vehicle by Officer Glenny. I opened the door and he placed her inside[]"). The plaintiff was later transported to the Allentown Police Department. Defs.' Facts at ¶ 28; Pl.'s Resp. to Defs.' Facts at ¶ 28.[8] Once at the police department and sitting on a bench, the plaintiff allegedly began to feel stomach pains and a lump on her stomach. Klein Dep. at 175–76. The plaintiff testified that she requested, and was denied, medical care from an unnamed man at the police station. Klein Dep. at 177–78. The plaintiff reportedly suffered from the following injuries due to the force applied during her arrest: (1) bruising and tightness of her wrists due to the handcuffing; (2) a hernia, which required surgery, from being aggressively thrown onto the concrete barrier between the rowhomes; and (3) exacerbation of her pre-existing carpal tunnel which required surgery. Klein Dep. at 145, 180.

The plaintiff was subsequently "charged with aggravated assault, simple assault and harassment in connection with the incidents on May 2, 2016." Defs.' Facts at ¶ 30; Pl.'s Resp. to Defs.' Facts at ¶ 30. The plaintiff successfully completed Accelerated Rehabilitative Disposition ("ARD"). Defs.' Facts at ¶ 35; Pl.'s Resp. at ¶ 35; *see also* Defs.' Facts in Supp. of Mot. for Summ. J., Ex. I ("Klein ARD") at 2, Doc. No. 56-9.

---

[8] It appears that the plaintiff was left unattended, but secured, in Officer Madison's vehicle while he went to look for the victim's car keys. Madison Dep. at 128–29. After his search proved unsuccessful, he drove the plaintiff to the police station. *Id.* at 133–34.

## C.    Analysis of the Plaintiff's Section 1983 Claims

"Section 1983 provides a civil remedy for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'" *Halsey v. Pfeiffer*, 750 F.3d 273, 290 (3d Cir. 2014) (quoting 42 U.S.C. § 1983). "To state a claim under section 1983, a plaintiff must demonstrate that 'some person has deprived him of a federal right . . . [and] that the person who has deprived him of that right acted under color of state or territorial law.'" *Id.* (quoting *Gomez v. Toledo*, 446 U.S. 635, 640 (1980) (alteration in original)). Here, the plaintiff brings several section 1983 claims against the Officers in their individual capacities: (1) excessive force; (2) unlawful search; (3) failure to intervene; (4) civil conspiracy; (5) denial of medical care; and (6) violation of due process. The defendants argue that the court should grant summary judgment in favor of the Officers because they did not violate the plaintiff's constitutional rights as to each of the claims and, with respect to her excessive force and unlawful search claims, they have qualified immunity. Br. in Supp. of the Mot. for Summ. J. of Defs., City of Allentown, (Former) Mayor Edwin Pawlowski, (Former) Chief Keith A Morris, Officer Stephen Madison, Officer Christopher Hendricks, Officer Michael Good, and Officer Jacoby Glenny ("Defs.' Br.") at 4–28, Doc. No. 55.

In addressing the parties' arguments, the court first addresses whether the Officers have qualified immunity regarding the plaintiff's excessive force and unlawful search claims. Then, the court discusses the merits of the plaintiff's failure to intervene, civil conspiracy, denial of medical care, and due process violation claims.

### 1.    Qualified Immunity: Excessive Force & Unlawful Search

The defendants have asserted the affirmative defense of qualified immunity as to the plaintiff's section 1983 claims for excessive force and unlawful search. The Officers have qualified immunity if their conduct "does not violate a clearly established statutory or constitutional right of which a reasonable person would have known." *Pearson v. Callahan*, 555

U.S. 223, 231 (2009). "The doctrine is designed to 'give[] government officials breathing room to make reasonable but mistaken judgments by protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *Bryan v. United States of Am.*, 913 F.3d 356, 362 (3d Cir. 2019) (quoting *City and Cty. of San Francisco, Cal. v. Sheehan*, 135 S.Ct. 1765, 1774 (2015)); *see also Pearson*, 555 U.S. at 231 ("The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." (citation and internal quotation marks omitted)). To determine whether an officer's conduct is entitled to qualified immunity, courts ask two questions,

> [o]ne is whether the defendant's conduct violated a statutory or constitutional right. The other is whether the right at issue was clearly established when the conduct took place. [Courts] have discretion to address either inquiry first.

*Sauers v. Borough of Nesquehoning*, 905 F.3d 711, 716 (3d Cir. 2018).

During this analysis, the court views the facts as most favorable to the non-moving party and "courts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam) (citing *Brosseau v. Haugen*, 543 U.S. 194, 195, 198 (2004)). Similarly, when addressing

> . . . either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment. This is not a rule specific to qualified immunity; it is simply an application of the more general rule that a judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. In making that determination, a court must view the evidence "in the light most favorable to the opposing party.

*Id.* at 656–57 (internal citations and quotation marks omitted).

As to the first question, courts should not "define clearly established law at a high level of generality." *Sauers*, 905 F.3d at 716. Courts are not required to identify "a case directly on point

for a right to be clearly established, [however,] existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S.Ct. 548, 551 (2017) (citation and internal quotation marks omitted).  Lastly, as an affirmative defense, "the burden of establishing qualified immunity falls to the official claiming it as a defense."  *Burns v. Pa. Dep't of Corr.*, 642 F.3d 163, 176 (3d Cir. 2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982)).

a.    Excessive Force

To determine whether Officers Madison, Glenny, and Hendricks (collectively the "Arresting Officers") are entitled to qualified immunity with respect to the plaintiff's excessive force claim, the court first determines whether a reasonable jury could conclude that the plaintiff established a violation of her Fourth Amendment rights.[9]  "Police officers are privileged to commit a battery pursuant to a lawful arrest, but the privilege is negated by the use of excessive force." *Groman v. Twp. of Manalapan*, 47 F.3d 628, 634 (3d Cir. 1995).  Force is excessive when it is unreasonable.  *Id.* (citation omitted).  Courts determine whether the force used is "objectively reasonable" based on the totality of the circumstances, *id.* at 634, and certain factors, including: "the facts and circumstances of each particular case, . . . the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham v. Connor*, 490 U.S. 386, 396–97 (1989).  In addition to the above factors (commonly referred to as the *Graham* factors), courts must also consider "other relevant factors [commonly referred to as the *Sharrar* factors] such as 'the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the

---

[9] As to Officer Good, the defendants argue that he is entitled to summary judgment because he did not participate in the arrest, Defs.' Br. at 4 n.1; however, the plaintiff did not bring a claim for excessive force under section 1983 against Officer Good.  *See* Compl. at 26 (bringing claim for excessive force "[a]gainst Individual Defendants Madison, Hendricks, and Glenny").

police officers must contend at one time.'" *Green*, 246 F. App'x at 161 (quoting *Sharrar v. Flesing*, 128 F.3d 810, 822 (3d Cir. 1997)).

Reasonableness is determined objectively, "but should give appropriate scope to the circumstances of the police action, which are often 'tense, uncertain, and rapidly evolving.'" *Groman*, 47 F.3d at 634 (quoting *Graham*, 490 U.S. at 397); *see also Gonzalez v. Murin*, C.A. No. 17-324 Erie, 2019 WL 858096, at *2 n.2 (W.D. Pa. Feb. 22, 2019) ("Courts have found these elements – significant injury and repeated complaints of pain – to be particularly relevant in determining whether an excessive force claim may be maintained in the context of handcuffing cases." (citations omitted)). "The reasonableness of the use of force is normally an issue for the jury." *Rivas v. City of Passaic*, 365 F.3d 181, 198 (3d Cir. 2004) (citing *Abraham v. Raso*, 183 F.3d 279, 290 (3d Cir. 1999)).

In the context of summary judgment, certain nuances arise. To the extent a police officer's version of events differs from the plaintiff's on summary judgment, "a police officer who is accused of having used excessive force is not 'precluded from arguing that he reasonably perceived the facts to be different from those alleged by the plaintiff,' but that '*contention* . . . must be considered at trial.'" *Id.* at 199 (emphasis in original) (quoting *Bennett v. Murphy*, 274 F.3d 133, 137 (3d Cir. 2002)). Further, to survive a motion for summary judgment, "a § 1983 plaintiff must produce evidence supporting each individual defendant's personal involvement in the alleged violation to bring that defendant to trial." *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 291 (3d Cir. 2018).

Here, the parties do not dispute that the officers "seized" the plaintiff when they arrested her, thus, "the only question is whether it was unreasonable." *Rivas*, 365 F.3d at 198. *Compare* Defs.' Facts at ¶ 25 ("No additional force was used on the Plaintiff."), *with* Pl.'s Resp. to Defs.'

Facts at ¶ 25 ("A genuine dispute exists."). The defendants argue that the Arresting Officers used appropriate force because the plaintiff shut the door on Officer Madison's hand and physically resisted arrest. Defs.' Br. at 6. The defendants also dispute the plaintiff's assertion that Officers Madison and Hendricks threw her into the porch railing. *Id.*; Defs.' Facts at ¶¶ 23, 25. In response, the plaintiff argues that disputed issues of fact preclude the court from granting summary judgment on the merits or because of qualified immunity. *See generally* Pl.'s Mem. at 7, 23.

As to the force applied, the parties dispute what force was applied during the plaintiff's arrest. Defs.' Facts at ¶¶ 23, 25; Pl.'s Resp. to Defs.' Facts at ¶¶ 23, 25. Officers Madison and Hendricks both dispute that they "threw" the plaintiff over the barrier. *Compare* Hendricks Dep. at 90 ("Q. By somebody throwing her on a railing. A. She was not thrown.") and Madison Dep. at 122 ("Q. Was [the plaintiff's body] not placed against the banister? A. Absolutely not."), *with* Klein Dep. at 92 ("[Officers Madison and Hendricks] had me jerked over my concrete wall and I kept telling him they're hurting me, they're hurting me, and I'm screaming and telling these people to stop hurting me."). Officer Glenny admits only to helping Officer Hendricks handcuff the plaintiff. *See* Glenny Dep. at 63–64 ("Q. Why did you help him handcuff him [sic]? A. She was resisting and she was yelling at -- at all of us. And she was not -- she didn't cooperate and place her hands behind her back. She had her -- needed assistance with -- with getting her hands behind her back and handcuffed."). Whereas the plaintiff argues that the officers who transported her to the car caused her pain by lifting her off the ground while cuffed. Klein Dep. at 143–44.[10]

The parties also dispute the nature of the plaintiff's behavior and demeanor during the entire incident. Evidence in the record supports two theories depending on whether the court believed the defendants or the plaintiff. Based on the record evidence cited by the defendants, the

---

[10] The record is unclear which officers she is referring to in this testimony. *See* Madison Dep. at 117 (describing Officer Glenny as assisting with handcuffing plaintiff).

plaintiff was uncooperative to the point of violence, namely first slamming Officer Madison's hand in the door and then punching him in the face. *See, e.g.*, Madison Dep. at 117 ("She was very, very wild. She was swinging her arms around -- and just very uncooperative."). According to the plaintiff's testimony, four uniformed police officers tried to unlawfully enter her home, and she attempted prevent the unlawful search by denying consent and closing her door. Klein Dep. at 91–92, 111–12, 120–21, 170–71. When she refused the Arresting Officers, they pulled her from her home, threw her over a barrier so violently that it caused a hernia, forcefully handcuffed her, and carried her from the porch with her feet floating in the air. *Id.* at 170–76. As the success of the plaintiff's claim depends on which version of events one believes, the court must deny summary judgment on this claim because disputed issues of material fact preclude the court from determining whether the Arresting Officers violated the plaintiff's Fourth Amendment rights as a matter of law.

As to the defendants' argument that the Arresting Officers are entitled to qualified immunity, even if there was a violation of the plaintiff's Fourth Amendment rights, the court cannot determine whether the Arresting Officers are entitled to the defense at this time. Both avenues to qualified immunity, *i.e.*, no violation or, if a violation, it is excused because the Arresting Officers made a reasonable mistake of law or fact, hinge on disputed facts (*e.g.*, whether the plaintiff punched Officer Madison, the degree to which the plaintiff resisted arrest, and the force applied during her arrest).[11] *See Giles v. Kearney*, 571 F.3d 318, 327 n.4 (3d Cir. 2009)

---

[11] To determine whether an officer made a "reasonable mistake" with respect to their use of force, the Third Circuit considers the *Graham* and *Sharrar* factors because the factors "are well-recognized and that when an officer applies them in an unreasonable manner, he is not entitled to qualified immunity." *Green*, 246 F. App'x at 162–63 (internal citation, internal quotation marks, and citation omitted). The court is unable to resolve this question because the parties dispute material facts at issue, namely whether the plaintiff punched Officer Madison and, the extent to which (if any), she was resisting detention. Because such factors are critical to the determination of whether the Arresting Officers applied excessive force, the court cannot decide whether a constitutional violation occurred and, if so, whether the Arresting Officers are entitled to qualified immunity. *See Giles*, 571 F.3d at 327 ("Although the District Court

("The question of whether Giles was fully subdued or not once he was on the ground with Blades sitting on him makes a difference as to whether a reasonable official would have considered the force used reasonable and necessary under the circumstances."). Therefore, the court denies the motion for summary judgment without prejudice with respect to the plaintiff's claim for excessive force against the Arresting Officers on the basis of qualified immunity.[12] *See, e.g.*, *Geist v. Ammary*, 617 F. App'x 182, 186 (3d Cir. 2015) (dismissing interlocutory appeal for lack of jurisdiction because district court found disputed issues of material fact precluded ruling on whether police officer had qualified immunity on excessive force claim); *Rivas*, 365 F.3d at 199 (holding that "it was for the jury to decide if the ensuing 'takedown' and force applied by the officers was objectively reasonable[]").

b.      Illegal Search

To determine whether the Officers are entitled to qualified immunity on the plaintiff's illegal search claim, the court first asks whether a reasonable jury could find that the Officers violated her Fourth Amendment rights by entering her home without a warrant. Here, the parties do not dispute that the Officers entered the plaintiff's home without a warrant.[13] However, the

---

[12] The defendants may re-raise their qualified immunity defense at trial. *See Geist v. Ammary*, 40 F. Supp. 3d 467, 483 (E.D. Pa. 2014) ("Qualified immunity, however, may be raised again as a defense after the disputed issues of fact are resolved." (citations omitted)).

[13] The defendants ask the court to grant summary judgment as to Officer Madison and Officer Glenny because they allegedly did not enter the plaintiff's home. Defs.' Br. at 7 n.3. The plaintiff does not address this argument. In actions brought under section 1983,

> [a] defendant . . . must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*. *Parratt v. Taylor*, 451 U.S. 527, 537 n. 3, 101 S.Ct. 1908, 1913 n. 3, 68 L.Ed.2d 420 (1981); *Hampton v. Holmesburg Prison Officials*, 546 F.2d 1077, 1082 (3d Cir. 1976). Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity.

*Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).

parties dispute whether such entry violated the Fourth Amendment because the Officers had exigent circumstances which privileged their entry. *See generally* Defs.' Br. at 7–10; Pl.'s Mem. at 8–11. The defendants primarily argue that either the "hot pursuit" and/or exigent circumstances exceptions privileged their entry because (1) the Officers were actively pursuing Brandon, a "fleeing felon;" (2) Brandon recently committed a "crime of violence;" and (3) witnesses "told the Officers his name, where he lived[,] and that he was seen running towards the back of [the p]laintiff's home in the alley." Defs.' Br. at 9–10.[14] In response, the plaintiff argues the Officers do not satisfy the "hot pursuit" exception because the Officers were not actively chasing Brandon. Pl.'s Mem. at 10.

i. *Whether the Officers Violated the Plaintiff's Fourth Amendment Rights When They Entered the Residence*

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

---

As to Officer Madison, it is disputed whether he crossed the threshold of the plaintiff's home while he was standing at the doorway. *See* Klein Dep. at 91–92 (describing Officer Madison as coming "into my doorway, pulls me out of the doorway"). Therefore, the court declines to grant summary judgement as to Officer Madison for lack of personal involvement. As to Officer Glenny, he testified that he did not enter the home after assisting Officer Madison with placing the plaintiff in the police car. *See* Glenny Dep. at 92 ("Q. Did you enter the house without a search warrant? A. No. Q. You were at the back door? A. I was at the -- back of the house and the yard."). However, Officer Glenny testified that he was aware that a search of the plaintiff's home was ongoing, and he participated in the investigation by going to the back door and standing in the backyard. *Id.* at 92–95. The backyard of one's home is generally considered to be "curtilage." *Estate of Smith v. Marasco*, 430 F.3d 140, 156 (3d Cir. 2005). "A person's curtilage is the area immediately adjacent to his home in which he has a legitimate expectation of privacy." *Id.* at 156 n.14 (citing *United States v. Dunn*, 480 U.S. 294, 300 (1987)). Because Officer Glenny admits to entering part of the plaintiff's property without a warrant, the court denies summary judgment based on lack of personal involvement.

[14] At oral argument, the defendants also argued that the plaintiff's ARD proceeding should preclude her from asserting an unlawful search claim under the Fourth Amendment because *Heck v. Humphrey*, 512 U.S. 477 (1994) bars the claim. The plaintiff addressed this argument in her sur-reply brief. Pl.'s Sur-Reply at 1–4. The court finds that *Heck* does not bar the plaintiff's Fourth Amendment claims (excessive force and unlawful search). *See, e.g.*, *Sanders v. Downs*, 420 F. App'x 175, 179 (3d Cir. 2011) (rejecting assertion that *Heck* bars plaintiff's unlawful search claim because "*Heck* does not typically bar actions for Fourth Amendment violations").

U.S. Const. amend. IV.  When a search occurs without a warrant, it is "presumptively unreasonable under the Fourth Amendment."  *See Parkhurst v. Trapp*, 77 F.3d 707, 711 (3d Cir. 1996) (citations omitted).  While a lawful search always requires probable cause, "certain circumstances can excuse the warrant requirement."  *Id.*  "One well-recognized exception applies when the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment."  *Kentucky v. King*, 563 U.S. 452, 460 (2011) (alteration in original) (citations and internal quotation marks omitted).  Courts commonly refer to the exception as "exigent circumstances."  *Id.* at 455.

"Examples of exigent circumstances include, but are not limited to, hot pursuit of a suspected felon, the possibility that evidence may be removed or destroyed, and danger to the lives of officers or others."  *United States v. Coles*, 437 F.3d 361, 366 (3d Cir. 2006) (citations omitted).  "The common thread is imminence—'the existence of a true emergency.'"  *United States v. Mallory*, 765 F.3d 373, 384 (3d Cir. 2014) (quoting *United States v. Simmons*, 661 F.3d 151, 157 (2d Cir. 2011)).  The burden to establish exigent circumstances is on the government and it is not an easy burden to overcome.  *See Coles*, 437 F.3d at 366 n.8 ("The Supreme Court has emphasized that exceptions to the warrant requirement are few in number and carefully delineated, ... and that the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches...." (citations and internal quotation marks omitted)).  Lastly, law enforcement cannot create the exigent circumstance themselves through their own investigatory behavior or "justif[y] [a warrantless search] by its fruits."  *Parkhurst*, 77 F.3d at 711 n.4.[15]

---

[15] The court also notes that while "the Fourth Amendment does not proscribe police from seeking citizens' voluntary assistance in discovering or investigating crime[,]" *United States v. Butler*, 405 F. App'x 652, 655–56 (3d Cir. 2010) (citing *Florida v. Bostick*, 501 U.S. 429, 439 (1991)), Officer Madison was not allowed to forcibly require the plaintiff to assist him in his investigation.  Officer Madison testified he attempted to obtain consent to enter the home and when the plaintiff refused, he proceeded to ask her investigatory questions about Brandon.  Madison Dep. at 74, 79–80.  She refused to answer his questions or allow him entry.  *Id.* at 74.  Officer Madison stated that he "held the door to keep her from closing -- it was a screen door -- a storm or screen door.  I held the door to keep her from closing it *so I could*

"In determining whether exigent circumstances existed, [the court] must review 'the facts and reasonably discoverable information available to the officers at the time they took their actions and in making this determination consider the totality of the circumstances facing them.'" *United States v. Jones*, 155 F. App'x 62, 65 (3d Cir. 2005) (quoting *Estate of Smith*, 318 F.3d at 518). Courts consider six factors (referred to as the "*Dorman* factors") when determining whether exigent circumstances existed:

> (1) the gravity of the crime that has been committed; (2) a reasonable belief that the suspect is armed; (3) a clear showing of probable cause based upon reasonably trustworthy information; (4) a strong belief that the suspect is in the premises; (5) "a likelihood that the suspect will escape if not swiftly apprehended"; and (6) peaceable entry, affording the suspect "an opportunity to surrender ... without a struggle and thus to avoid the invasion of privacy involved in entry into the home."

*United States v. Anderson*, 644 F. App'x 192, 195 (3d Cir. 2016) (quoting *Dorman v. United States*, 435 F.2d 385, 392–93 (D.C. Cir. 1970)), *cert. denied*, 137 S.Ct. 130 (2016).[16]

Application of the *Dorman* factors is fact intensive and difficult to generalize.[17]  However, the contours of the "hot pursuit" exception are clearer.  The Supreme Court has stated that "some

---

*continue to speak with her*." *Id.* at 74–75 (emphasis added).  When pressed in his deposition, Officer Madison further stated that he felt that she had to answer his questions, specifically he testified that, "[a]s I said before, there was an active police investigation.  So I felt I did have the right to obtain more information from her in order to effect a proper arrest." *Id.* at 87.  The Officers were permitted to approach the Residence for the purposes of investigating the crime, however, "[t]he flip side of this is that citizens are free not to cooperate with a 'knock and talk' investigation, and, absent a warrant, police cannot detain them, demand entry into their homes, or otherwise compel their cooperation unless an exception to the warrant requirement applies."  *Butler*, 405 F. App'x at 656–57 (citing *United States v. Thomas*, 430 F.3d 274, 277–78 (6th Cir. 2005)).

[16] "The Supreme Court has referred to *Dorman* as 'a leading federal case defining exigent circumstances.'"  *Anderson*, 644 F. App'x at 195 n.2 (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 751 (1984)).  Some courts in the Third Circuit have applied a slightly different formulation of these factors to determine whether exigent circumstances exist.  *See, e.g., Jones*, 155 F. App'x at 65 ("We have identified certain factors as relevant to an analysis of exigent circumstances. Among these factors are: (1) that a grave offense has been committed; (2) that the suspect sought is reasonably believed armed; (3) that a strong reason exists to believe that the suspect is on the premises; and (4) a likelihood that the suspect might escape if not caught quickly." (citing *Gov't of V.I. v. Gereau*, 502 F.2d 914, 928 (3d Cir. 1974), *abrogated on other grounds by Corley v. United States*, 556 U.S. 303 (2009)); *United States v. Williams*, 612 F.2d 735, 739 (3d Cir. 1979) (same).  Because the factors are not meaningfully different and district courts in the Third Circuit frequently apply the *Dorman* factors, *see Zavec v. Collins*, No. 3:16-CV-00347, 2017 WL 3189284, at *6 (M.D. Pa. July 27, 2017) (citing to *Anderson* applying *Dorman*), the court will apply the *Dorman* factors.

[17] *See, e.g., Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 298 (1967) (finding exigent circumstances when "[t]he police were informed that an armed robbery had taken place, and that the suspect had entered 2111 Cocoa Lane less than five minutes before they reached it"); *United States v. Warren*, 723 F. App'x 155, 160 (3d Cir. 2018)

element of a chase will usually be involved in a 'hot pursuit' case[,]" *United States v. Santana*, 427 U.S. 38, 43 n.3 (1976), and a "claim of hot pursuit is unconvincing" without an "immediate or continuous pursuit of the petitioner from the scene of a crime." *Welsh*, 466 U.S. at 753; *see also Ramirez v. City of Camden, N.J.*, Civ. No. 13-1502 (JBS/AMD), 2015 WL 1403717, at *4 (D.N.J. Mar. 26, 2015) (denying summary judgment due to disputed issue of material fact regarding whether officers actually chased suspect into his mother's home because, without actual chase, officer could not rely on "hot pursuit" exception). Specifically, the Court has held that there is "no element of 'hot pursuit' in the arrest of one who was not in flight, was completely surrounded by agents before she knew of their presence, who claims without denial that she was in bed at the time, and who made no attempt to escape." *Johnson v. United States*, 333 U.S. 10, 16 n.7 (1948); *see also Paredes v. Egg Harbor Twp. Bd. of Educ.*, Civ. A. No. 15-2929 (JBS/JS), 2018 WL 3930087, at *7 (D.N.J. Aug. 16, 2018) (vacating previous grant of summary judgment in favor of defendants on reconsideration because there was no hot pursuit and/or exigent circumstances to justify entry when defendant returned stolen goods to police and he did not flee into home, but rather, denied officers entry without warrant); *United States v. Anderson*, Crim. A. No. 13-119, 2014 WL 1281062, at *3 (E.D. Pa. Mar. 28, 2014) (finding case where restricted duty officer merely followed suspect from scene of crime to home and watched him until eventually arrested by on duty officers not a case of "hot pursuit"), *aff'd*, 644 F. App'x 192 (3d Cir. 2016); *United*

(affirming district court's finding of "imminent danger" exception pursuant to exigent circumstance doctrine because law enforcement was faced with "the chaos, bloody stabbing, compressed period of time, and the chest-level gun" when they entered home); *Williams*, 612 F.2d at 739 (finding exigent circumstances where "the officers had reasonable cause to believe from the informant-information that appellant had just been involved in a very serious crime, that he had fired his weapon at a witness in escaping the scene and that he was going to get his affairs together and go south, from all of which the officers were more than justified in believing that armed flight was imminent[]"); *Zavec*, 2017 WL 3189284, at *6 (finding no exigent circumstances where threat posed by defendant was minor, "no risk" of immediate escape, forcible entry into home by police, *i.e.*, officer charged at defendant and tackled defendant, no attempt at peaceable surrender); *United States v. Anderson*, Crim. A. No. 11-30-GMS, 2011 WL 4442733, at *5 (D. Del. Sept. 23, 2011) (finding exigent circumstances when defendant matched suspect description, walked as if he was concealing a weapon, and fled from law enforcement officers into his mother's house).

*States v. Dukes*, Crim. A. No. 07-169, 2008 WL 2600296, at *6 (E.D. Pa. June 30, 2008) ("Upon the approach of the police, Mr. Dukes attempted to evade police by running into the garage, thus *initiating* the exigent circumstance of hot pursuit." (emphasis added)), *aff'd*, 387 F. App'x 196 (3d Cir. 2010); *United States v. Francis*, Crim. A. No. 90-41, 1990 WL 79414, at *3 (E.D. Pa. June 8, 1990) (finding officer's chase of suspect from street into building "clearly a 'hot pursuit' situation").

In the present case, a reasonable jury could find that the defendants violated the plaintiff's Fourth Amendment rights when they entered the Residence without a warrant. The court addresses each *Dorman* factor in turn.

The first factor, the gravity of the crime, weighs in favor of finding that exigent circumstances privileged the search. The parties do not dispute that the Officers arrived at the scene in response to a violent crime, and the Officers acknowledge that they were investigating a violent crime and not a minor offense such as a traffic violation.[18] *See* Madison Dep. at 145 ("Q. Did you know – well, you were – you were investigating what was a violent assault. Correct? A. Correct."). *Compare* Defs.' Facts at ¶ 10 ("The victim reported that a man named Brandon physically assaulted her, removed her from the car and dragged her across the concrete by her hair."), *with* Pl.'s Resp. to Defs.' Facts at ¶ 10 ("The statement of fact that Madison so testified is conceded."). When the nature of the crime is violent and not a "minor offense," it weighs in favor of finding exigent circumstances. *See Welsh*, 466 U.S. at 750 ("When the government's interest is only to arrest for a minor offense, that presumption of unreasonableness is difficult to rebut, and

---

[18] Courts have concluded that law enforcement officers should not rely on the hot pursuit exception for minor criminal offenses. *See, e.g.*, *Zavec*, 2017 WL 3189284, at *6 (finding that officers did not engage in hot pursuit where they arrested plaintiff for minor offense, plaintiff did not retreat into home but rather continued to stand in doorway of home in view of officers on sidewalk, there was no risk of flight, and officers forcibly entered home).

the government usually should be allowed to make such arrests only with a warrant issued upon probable cause by a neutral and detached magistrate.").

As to the second factor, the Officers did not have a reasonable belief that the suspect was armed. The victim did not report that the crime occurred with a weapon. Madison Dep. at 145. The Officers' only rationale that he *may* have been armed is the general assumption that someone who commits a crime *may* have access to weapons inside their home. Specifically, Officer Madison testified that "it was a concern" that Brandon may have "access to weapons in the home." *Id*. at 146. While this general assumption has some significance, law enforcement officers likely have (or could have) this same assumption in almost *all* circumstances involving individuals accused of assault. *Cf. United States v. Butler*, 405 F. App'x 652, 661–62 (3d Cir. 2010) ("[P]olice officers will almost always have *some* reason to suspect that the targets of their drug investigations are armed." (emphasis in original)). However, unlike instances where the victim reports that the suspect used a weapon in the commission of the crime, there was no such report here. *See* Madison Dep. at 48 (stating victim indicated that Brandon struck her with his fist); *see also Anderson*, 644 F. App'x at 194–95 (finding exigent circumstances when officer witnessed armed robbery of convenience store, suspect "retained the weapon" upon leaving scene, and officer knocked on door and suspect answered). If a general suspicion that a suspect may be armed was enough, it would be rare to find a case where the police did not have exigent circumstances. Therefore, the court finds that this factor does not weigh in favor of finding exigent circumstances.

Concerning the third factor, the police had probable cause to obtain a search warrant of the Residence and an arrest warrant for Brandon. Probable cause exists when "the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be

arrested." *Orsatti*, 71 F.3d at 483 (citations omitted). "In other words, the constitutional validity of the arrest does not depend on whether the suspect actually committed any crime." *Wright v. City of Phila.*, 409 F.3d 595, 602 (3d Cir. 2005) (citing *Johnson v. Campbell*, 332 F.3d 199, 211 (3d Cir. 2003)).

Here, the Officers were responding to a 9-1-1 call wherein a witness reported that a male recently assaulted a female. *See* Pl.'s Mem., Ex. 3, Notes from 9-1-1 Calls at ECF p. 25 ("Um, I heard screaming outside. A woman was being attacked by a man. She said she was taking him home. When I came out, um, I seen him punch her right in her face."), Doc. No. 58-3.[19] The Officers went to the scene and several officers interviewed the victim and two witnesses, both of whom stated the suspect ran in the direction of the plaintiff's home. Defs.' Facts at ¶¶ 12–13; Pl.'s Resp. to Defs.' Facts at ¶¶ 12–13. The victim and witnesses also revealed the identity of the suspect, Brandon, and where he lived to several officers. Defs' Facts at ¶ 10; Pl.'s Resp. to Defs.' Facts at ¶ 10. These facts gave the Officers probable cause to believe that Brandon committed an offense. *Orsatti*, 71 F.3d at 483; *see Johnson v. 6 Unidentified City of Wilmington Police Officers*, Civ. A. No. 08-479-JJF, 2010 WL 1644258, at *5 (D. Del. Apr. 21, 2010) (finding probable cause when police saw "bloody trail from sidewalk to the house[,]" knew victim was previously inside house, and knew shooting occurred in area). Thus, this factor weighs in favor of finding exigent circumstances.

As to the fourth factor, the Officers also had a reasonable belief that Brandon was at the Residence because of the information reported by the victim and witnesses. Even if the witnesses did not tell the Officers that Brandon ran into the home, it is reasonable to assume that it was his

---

[19] The plaintiff's exhibits are attached in a single document. The court refers to the ECF page number for ease of reference.

likely destination given the proximity of the Residence to the incident. Therefore, this factor also weighs in favor of finding exigent circumstances.

The fifth factor does not weigh in favor of justifying the Officers' entry into the Residence.[20] While Brandon fled the scene of the crime, there was no active chase between him and the police. *See Minnesota v. Olson*, 495 U.S. 91, 101 (1990) (finding no exigent circumstances when individual was merely driver of getaway car, it was 3:00 p.m. on Sunday, and it was "evident that the suspect was going nowhere; and that if he came out of the house he would have been promptly apprehended"). The Officers also did not report hearing sounds of flight when they spoke with the plaintiff at her doorway. *Cf. Jones*, 155 F. App'x at 65–66 (finding exigent circumstances present where suspected murderer knew he was wanted for murder, suspect previously evaded arrest, officers suspected suspect may violently resist arrest, officers received credible tip about suspect's whereabouts, and officers heard sounds of flight upon their arrival). Therefore, the court finds this factor weighs against finding exigent circumstances.

The sixth factor also does not weigh in favor of finding exigent circumstances. The Officers' entry into the home was not peaceable. While the Officers did attempt to gain the plaintiff's consent to enter, when she refused to let them inside, Officer Madison admits that he refused to allow her to close the door. Specifically, Officer Madison stated in his deposition that he "held the door to keep her from closing -- it was a screen door -- a storm door or screen door. I held the door to keep her from closing it so I could continue to speak with her." Madison Dep. at 74–75. Notably, in Officer Madison's "arrest narrative" he states that he "grabbed the screen door before it could be fully closed" which in turn caused his hand to get stuck and a struggle to

---

[20] The court notes that this factor is fairly duplicitous with the general "hot pursuit" doctrine. Therefore, the court addresses whether there was any element of a "chase" separately from this factor.

ensue with the plaintiff. Pl.'s Mem., Ex. 4 ("Allentown Police Dep't Offense Reps.") at ECF p. 36, Doc. No. 58-3.[21]

The defendants seek to rely on *Grayer v. Township of Edison*, 198 F. App'x 203, 208 (3d Cir. 2006), for support of their argument that the Officers' entry was peaceable. *See* Defs.' Br. at 26–28. Defendants' arguments based on *Grayer* fail because, unlike the plaintiff in Grayer who gave "some manner of consent" to the police officers, there was no modicum of consent provided by the plaintiff. *Grayer*, 198 F. App'x at 208. A physical struggle between an elderly woman and two police officers at 3:00 a.m. is not peaceable entry. *Cf. Mallory*, 765 F.3d at 387 (rejecting argument that family was hostile to search of home when they "briefly protest[ed] the warrantless entry of their home in the middle of the night" (citing *United States v. Katoa*, 379 F.3d 1203, 1205 (10th Cir. 2004)). After considering the *Dorman* factors, the court finds that a reasonable fact finder could determine that the Officers lacked exigent circumstances to enter the Residence.

Lastly, this case does not fit within the "hot pursuit" exception. While the "hot pursuit" exception does not require a continuous chase or "an extended hue and cry in and about (the) public streets[]" typically "some type of chase" is required. *Santana*, 427 U.S. at 42–43 (internal quotation marks omitted). Unlike situations where the suspect runs away upon seeing uniformed officers, even if the police lose sight of the suspect, or the chase is short, here, the Officers merely knew he ran in the direction of the Residence.[22] It is uncontested that the Officers never saw or chased Brandon. The lack of *any* chase is fatal to the defendants' reliance on this exception. *See*

---

[21] This report is dated as "reviewed" by Officer Madison on May 5, 2016. In a report dated May 2, 2016, Officer Madison states that "Klein attempted to close the screen door, to which I was able to grab it." Allentown Police Dep't Offense Reps. at ECF p. 39.

[22] What the Officers were told at the time they approached the house is contested. The plaintiff argues that they were never informed that he ran into the house and only Officer Good's affidavit supports that fact. *See* Defs.' Facts at ¶ 13 (referencing Officer Good's affidavit for statement that victim stated that Brandon fled into Residence); Pl.'s Resp. to Defs.' Facts at ¶ 13 ("It is not contested that Officer Good has made this statement. It is contested that this occurred.").

*Ramirez*, 2015 WL 1403717, at *4 (finding defendants not entitled to qualified immunity on plaintiff's unlawful search claim because police did not actively chase plaintiff's son from street to plaintiff's door). *Cf. Jordan v. McLaughlin*, No. 1:09-cv-88-SJM-SPB, 2013 WL 1182746, at *11 (W.D. Pa. Mar. 21, 2013) (finding case sufficiently within "hot pursuit" doctrine where chase was briefly interrupted when one officer lost "site [sic] of the suspect van and the point at which Plaintiff's van (matching the general description) was discovered a short distance away"). Law enforcement cannot rely on the hot pursuit exception to justify their warrantless entry into a home based solely on the fact that a suspect commits a crime near his house and the officers conduct a successful investigation thereby leading them to the suspect's likely location. Therefore, the court finds that this exception does just justify the defendants' search of the Residence.

   ii.   *Whether the Officers are Entitled to Qualified Immunity on the Unlawful Search Claim*

   As stated above, the court finds that a reasonable fact finder could conclude that the Officers' violated the plaintiff's Fourth Amendment rights by entering her home without a warrant; therefore, the court must determine whether the Officers are entitled to qualified immunity. Because the court has already determined that a reasonable jury could find the Officers violated her Fourth Amendment rights, the court moves onto the second question of whether the right at issue is clearly established.

   The right to be free of warrantless searches of one's residence unless exigent circumstances apply is clearly established—"a search or seizure carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions based on the presence of 'exigent circumstances.'" *Coolidge v. New Hampshire*, 403 U.S. 443, 474–75 (1971) (footnote and citations omitted). The defendants do not appear to dispute this contention. *See* Defs.' Br. at 28 ("It is well established that a warrantless

entry may be justified by exigent circumstances, such as hot pursuit of a fleeing felon."). Therefore, the court finds that such a right is clearly established.

The defendants also argue the Officers are entitled to qualified immunity because "the situation, as perceived by the Defendants at the time was not so clear that a reasonable officer would conclude that exigent circumstances did not exist to enter the Plaintiff's home to search for her son." *Id.*[23] "If the wrongfulness of the officer's conduct would have been clear, [the court] must then determine whether he made a reasonable mistake." *Carswell v. Borough of Homestead*, 381 F.3d 235, 243 (3d Cir. 2004). The defendants make two arguments as to why the Officers were reasonably mistaken: (1) the defendants rely on *Grayer* as the basis for the Officers' reasonable belief their entry was privileged and (2) they made a reasonable mistake of law in applying the "hot pursuit" exception. Defs.' Br. at 27–28. The court addresses each in turn.

As to their first argument, *Grayer* does not stand for the proposition cited by the defendants. In *Grayer*, police officers spotted Thomas Raiford ("Raiford") out in public. 198 F. App'x at 205. The police had a warrant for Raiford's arrest. *Id.* Once Raiford saw the police, he ran and entered an apartment. *Id.* The police "lost sight of him" when he ran into the building but had "reason to believe Raiford thereafter entered the nearby apartment of Raiford's aunt[, the appellant, Grayer]." *Id.* at 205–06. The police approached Grayer's apartment and sought her consent to enter and search for Raiford. *Id.* at 206. Grayer gave one of the officers, Sergeant Anderko, her consent to enter. *Id.* Next, Grayer called out for Raiford. *Id.* When Raiford responded, the officers ordered

---

[23] The court notes there are several disputed facts related to the search. As indicated earlier in this opinion, the parties dispute whether anyone told the Officers that Brandon went into the Residence. Additionally, the Officers provided conflicting testimony about whether witnesses told them Brandon ran into the Residence. *Compare* Madison Dep. at 51 (testifying that witness at scene told him that Brandon "ran in that direction" and "pointed to a house"), *with* Defs.' Facts, Ex. D, Aff. of Officer Michael Good ("Good Aff.") at ¶ 5 ("The victim, who was outside in her car, advised that a male assaulted her and ran into 830 N. 9th Street – Plaintiff's home."), Doc. No. 56-4. These facts are not material to the court's analysis because, even under the Officer's description of the facts, it was not a reasonable mistake of law or fact to believe they had exigent circumstances to enter the house.

him to surrender. *Id.* He surrendered and the police arrested him. *Id.* After Raiford's arrest, one of the officers, Detective Wheeler, tried to enter the kitchen of the apartment and Grayer put her body between him and the door and "told him not to open it." *Id.* The officer then testified that Grayer pushed him, so he detained and arrested her. *Id.*

The Third Circuit found that a "reasonable police officer could believe that the pursuit of Raiford into Grayer's home, even in the absence of the owner's consent, was constitutional[]" because "[p]olice officers had been chasing Raiford, for whom they had an arrest warrant, lost sight of him, had reason to believe he was in Grayer's apartment, and, apparently, saw him from the rear of the building at or around the time Anderko and Wheeler entered the building." *Id.* at 207. In determining that the Sergeant Anderko made a reasonable mistake of law in entering the apartment, the court also relied upon the fact that Grayer provided some element of consent to enter. *Id.* at 208. The court held that if Sergeant Anderko was mistaken about his ability to enter the apartment lawfully, "that mistake—in light of the exigency and at least a measure of consent—was reasonable." *Id.*

Here, each of the key facts in *Grayer* is distinguishable. First, the Officers never chased Brandon, even briefly, into the home. It is undisputed that Brandon fled the scene before the Officers arrived. Second, the plaintiff never consented, under any fair reading of the facts, to the Officers entering the Residence. *See* Defs.' Facts at ¶ 21 ("The Plaintiff advised that they could not come in without a warrant."). Therefore, *Grayer* is inapplicable to whether the Officers made a reasonable mistake of law.

The defendants also offer no basis for why the Officers needed to immediately enter the Residence. The "common thread" between all exigent circumstances exceptions to the warrant requirement "is imminence—'the existence of a true emergency.'" *Mallory*, 765 F.3d at 384

(quoting *United States v. Simmons*, 661 F.3d 151, 157 (2d Cir. 2011)). Here, the Officers have failed to put forth any rationale why they could not wait to obtain a search warrant and, drawing all reasonable inferences in favor of the plaintiff, the record does not support an argument that the Officers imminently needed entry into the home.[24] The Officers arrived at the house and the plaintiff answered the knock at her door. The plaintiff did not appear to be in distress, and the victim was safely in the presence of the police. Additionally, there were at least four police officers at the scene. The defendants failed to provide a reason why some of the officers could not watch the Residence to ensure Brandon did not attempt to escape while one of the officers obtained a search warrant. "Inconvenience to the officers and some slight delay necessary to prepare papers and present the evidence to a magistrate" are "never very convincing reasons, and in these circumstances, certainly not enough to bypass the constitutional requirement." *Johnson*, 333 U.S. at 15. Therefore, the court finds it was not a reasonable mistake of law for the Officers to believe they had exigent circumstances to enter the Residence without a warrant.

As to their second argument, that the Officers believed they were in "hot pursuit," this argument also fails. The defendants argue that because Brandon "assaulted a woman to the point of being unconscious and then fled the scene" and that "[w]itnesses identified who he was, where he lived, and where he had fled – Plaintiff's home[,]" the Officers were justified in believing they were in "hot pursuit" and could enter the home. Defs.' Br. at 28. This is not a reasonable mistake

---

[24] Officer Hendricks testified to this point in his deposition:

> Q. "[i]f you initially wanted to de-escalate things, why didn't you simply secure the residence before, you know, the -- the -- the door, you know, caught Madison's hand, if it did, or before there was contact with his face. Why didn't you say to Mrs. Klein, [a]ll right, you know, we'll go get a warrant as you've demanded?"
> A. Why didn't I do that initially?
> Q. Yeah.
> A. We tried to talk to her about the fact that we just had someone run in and we wanted to -- we wanted to -- *we wanted to be allowed to look for him*.

Hendricks Dep. at 98–99 (emphasis added).

of law because every hot pursuit case involves "some sort of a chase." *Santana*, 427 U.S. at 42–43. Here, it is undisputed the Officers never chased Brandon. The Officers only knew of his likely location and that he was a suspect in a crime. Defs.' Br. at 28 ("Defendants responded to the home believing that the Plaintiff's son was hiding there."). Officers are not rewarded with the right to make warrantless searches simply because their investigations yield quick results. This is a rule that all but the "plainly incompetent" know. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Therefore, because "[a]ny other rule would undermine 'the right of the people to be secure in their persons, houses, papers and effects,' and would obliterate one of the most fundamental distinctions between our form of government, where officers are under the law, and the police-state where they are the law[,]"*Johnson*, 333 U.S. at 17 (internal footnote omitted), the court: (1) denies summary judgment regarding the plaintiff's section 1983 illegal search claim because a reasonable fact finder could determine that there was a violation of the plaintiff's Fourth Amendment rights and (2) finds that the Officers are not entitled to qualified immunity on this claim.

**2.    Remaining Section 1983 Claims:  Failure to Intervene, Civil Conspiracy, Denial of Medical Care, and Fourth Amendment Due Process**

The plaintiff brings four additional claims under section 1983 against the Officers in their individual capacities: failure to intervene, civil conspiracy, denial of medical care, and a violation of her Fourteenth Amendment due process rights. The court addresses each in turn.

### a.    Failure to Intervene

The plaintiff argues that the Officers failed to intervene to prevent the violation of her constitutional rights against excessive force and unlawful search. Compl. at ¶¶ 119–129. The defendants argue they are entitled to summary judgment because (1) there was no predicate constitutional violation, and (2) even if there was a violation, the officers had no "reasonable opportunity to intervene." Defs.' Br. at 11–12. The plaintiff argues that there are disputed issues

of material fact with respect to the underlying violations and whether the respective defendants had an opportunity to intervene.  Pl.'s Mem. at 11–12.

To be directly liable under a failure to intervene theory, (1) the plaintiff must have "demonstrate[d] that her underlying constitutional rights were violated[,]" *Adams v. Officer Eric Selhorst*, 449 F. App'x 198, 204 (3d Cir. 2011) (citing *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005)); (2) the officer had a duty to intervene; and (3) the officer must have had a "realistic and reasonable opportunity to intervene."  *Smith v. Mensinger*, 293 F.3d 641, 650–51 (3d Cir. 2002) (citation omitted).  In the context of excessive force cases, "a police officer has a duty to take reasonable steps to protect a victim from another officer's use of excessive force, even if the excessive force is employed by a superior."  *Id.* at 650.  Courts should deny summary judgment if the parties dispute whether the officer had a reasonable opportunity to intervene.  *See id.* at 650 ("Moreover, it is undisputed that all of the named officers were in the vicinity at some point when Smith alleges he was beaten.  The extent of each officer's participation is thus a classic factual dispute to be resolved by the fact finder."); *Hayward v. Salem City Bd. of Educ.*, Civ. A. No. 14-5200 (JBS/AMD), 2016 WL 4744132, at *5 (D.N.J. Sept. 12, 2016) ("A reasonable view of the facts may demonstrate that Officer Sieber, who was one of four persons in a small office room, was aware of the physical search, despite his contrary assertions.").

Here, the plaintiff alleges that the Officers failed to intervene with respect to two constitutional violations: excessive force and the illegal search of her Residence.  First, for the reasons stated above, a reasonable jury could find the Officers violated the plaintiff's Fourth Amendment rights when they entered her Residence and used excessive force in arresting her. Second, the court must deny summary judgment on her failure to intervene claim as to all the

Officers because each of them was near both events and it is a disputed issue of material fact whether each officer had a reasonable opportunity to intervene.

Officer Glenny observed Officers Madison and Hendricks restrain the plaintiff, helped Officer Madison handcuff the plaintiff, and assisted in taking her to Madison's squad car. Glenny Dep. at 62–63. A reasonable jury could find that because Officer Glenny was close enough to assist in her restraint, that he could have intervened to prevent the excessive force. Officer Glenny also went to the backyard of the Residence while certain other officers went inside. Glenny Dep. at 92. If Officer Glenny had time to stand guard in the plaintiff's backyard, a reasonable jury could find that he had a reasonable opportunity to prevent the allegedly illegal search.

Officer Good, who the parties unfortunately did not depose, submitted an affidavit which indicates that he near the event and attests to personal knowledge as to what occurred on the porch and during the plaintiff's arrest. *See generally* Good Aff. at ¶¶ 4–13. The supplement to the "incident narrative" prepared by Officer Good also states that he went into the home with Officer Hendricks. Allentown Police Dep't Offense Reps. at ECF p. 35. The reasonable inferences drawn from the record, *i.e.*, that he was in the area near the arrest and search, are sufficient to deny summary judgment as to the plaintiff's failure to intervene claims against Officer Good.

Officer Hendricks actively participated in restraining the plaintiff and could have intervened in Officer Madison's use of force.[25]   Officer Hendricks also went into the home.

---

[25] Concerning the plaintiff's failure to intervene to prevent the unlawful search claim, the defendants argue that the court should grant summary judgment because Officers Madison and Glenny had no "reasonable opportunity" to intervene because they were placing the plaintiff into Officer Madison's vehicle during the search. Defs.' Br. at 12–13. The record is unclear as to what occurred after the plaintiff's arrest and whether the Arresting Officers could have intervened to prevent the search of the home. For example, the plaintiff remained on the scene long enough for Brandon to be brought out of the house and placed under arrest, and Officer Madison had time to search for the keys to Brandon's car prior to transporting the plaintiff to the police station. Madison Dep. at 133, 134. Because it does not appear so implausible that the officers near the allegedly illegal search could have prevented the search once the plaintiff was detained, summary judgment is denied.

Hendricks Dep. at 96 (describing himself as unlocking back door to allow other officers inside home). Therefore, a reasonable jury could find that he had an opportunity to intervene.

Officer Madison was the primary actor in the arrest. As a result, a reasonable jury could find he had a reasonable opportunity to prevent the any excessive force applied by Officers Glenny and Hendricks. While Officer Madison did not enter the home, it appears that he was on the scene for some time after the other officers restrained the plaintiff. As already stated, the plaintiff remained on the scene long enough for Brandon to be brought out of the house and placed under arrest, and Officer Madison had time to search for the keys to Brandon's car prior to transporting the plaintiff to the police station. Madison Dep. at 133–34. At bottom, the record supports the plaintiff's augment that each officer had the opportunity prevent the constitutional violations from occurring. Therefore, the court denies the request for summary judgment on this claim.

### b.     Civil Conspiracy

"To prevail on a conspiracy claim under § 1983, a plaintiff must prove that persons acting under color of state law 'reached an understanding' to deprive him of his constitutional rights." *Jutrowski*, 904 F.3d at 293–94 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150–52 (1970)). The plaintiff also must establish the "predicate" constitutional tort to succeed on a claim for civil conspiracy. *Glass v. City of Phila.*, 455 F. Supp. 2d 302, 359–60 (E.D. Pa. 2006); *see also Rink v. Ne. Educ. Intermediate Unit 19*, 717 F. App'x 126, 141 (3d Cir. 2017) ("There can be no civil conspiracy to commit an unlawful act under § 1983 where the plaintiff has not proven a deprivation of a constitutional or federal statutory right or privilege."). Conclusory allegations of a conspiracy are insufficient to establish a civil conspiracy under section 1983. *See, e.g.*, *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir. 1985) (stating that "bare assertions, conclusory allegations or suspicions[]"are insufficient to survive a Rule 56 motion).

Thus,

the rule is clear that the plaintiff must provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action. To show agreement, he must demonstrate that the state actors named as defendants in the[] complaint somehow reached an understanding to deny [the plaintiff] his rights, and in the absence of direct proof, that meeting of the minds or understanding or agreement to conspire can be infer[red] from circumstantial evidence. Such circumstantial evidence may include that the alleged conspirators did or said something ... to create an understanding, the approximate time when the agreement was made, the specific parties to the agreement[,] the period of the conspiracy, or the object of the conspiracy. And in the context of an alleged conspiracy among police officers, it may manifest as conversations between officers about the incident, allegedly distorted stories that emerged, an awareness of conflicting stories and irregularities in the series of official investigations into the incident.

*Jutrowski*, 904 F.3d at 295 (alterations and omissions in original) (internal citations and quotation marks omitted).

Here, the plaintiff argues two bases for her civil conspiracy claim: (1) an agreement to violate her Fourth Amendment rights based on a conversation between Officers Madison and Hendricks and (2) that the defendants fabricated evidence as part of a conspiracy to cover-up constitutional violations committed during the arrest and search. Pl.'s Mem. at 13–14. As to her first argument, the plaintiff did not produce any record evidence of a conspiracy to violate her constitutional rights other than testifying that prior to entering her home, Officer Hendricks allegedly turned to Officer Madison and said, "it's your call, Bud." Klein Dep. at 92. While the court finds this argument very weak, drawing all reasonable inferences in favor of the plaintiff with respect to the conversation's purpose, it is sufficient to survive summary judgment. Given the procedural posture, the court cannot hold, as a matter of law, that the conversation does not provide evidence of a civil conspiracy because to do so requires the court to credit disputed material facts, namely that the conversation never happened. According to the plaintiff, the two officers came to an agreement and then conducted a warrantless search of her home. It is plausible

this conversation was an agreement to illegally enter the home in violation of the plaintiff's Fourth Amendment rights and the court cannot make a contrary factual finding on summary judgment. *See Jutrowski*, 904 F.3d at 295 (stating that "an allegation of conspiracy can only be overcome at summary judgment when the moving parties' submissions foreclose[] the possibility of the existence of certain facts from which 'it would be open to a jury ... to infer from the circumstances that there had been a meeting of the minds[.]" (omissions in original) (citation and internal quotation marks omitted)).

The plaintiff's second argument, while weakly supported by the record, also survives summary judgment. The plaintiff alleges that the Officers conspired to cover up the constitutional violations in this case by fabricating evidence, namely submitting false police reports. *See* Pl.'s Mem. at 14 ("In addition, there is evidence that the officers conspired to cover up their actions by submitting false police reports that significantly downplayed the amount of force they used against Klein."). The plaintiff also points to an allegedly false affidavit submitted by Officer Hendricks.[26] Pl.'s Sur-Reply Br. in Resp. to Defs.' Mot. for Summ. J. at 5, Doc. No. 68.

Drawing all reasonable inferences in favor of the plaintiff, the incident reports support an argument that the Officers conspired to downplay the incident. For example, Officer Hendricks describes the Officers as asking "politely" to enter the home and the plaintiff as becoming "very short and increasingly angry." Allentown Police Dep't Offense Reps. at ECF p. 40. Officer Hendricks also states that "K[l]ein escalated without reason even more when she suddenly grabbed the metal storm door and closed it on [Officer Madison's] hand." *Id.* Additionally, all the Officers tell the same story, that the plaintiff punched Officer Madison. The plaintiff disputes that she punched Officer Madison and the punch formed the basis for her arrest. The court finds, viewing

---

[26] Unless the plaintiff refers to Officer Hendrick's incident report as his "affidavit," the affidavit does not appear to be in the record.

all reasonable inferences in favor of the plaintiff, that a reasonable jury could find that the Officers conspired to make the plaintiff appear worse in the reports to justify her arrest and their search. Therefore, while bare allegations that police reports differ from the plaintiff's version of events are insufficient to establish a civil conspiracy under section 1983 to violate her rights by submitting "false" police reports, *Jutrowski*, 904 F.3d at 288–89, the court will deny summary judgment on this claim because "[i]nferring mental state from circumstantial evidence is among the chief tasks of factfinders," *United States v. Wright*, 665 F.3d 560, 569 (3d Cir. 2012).

### c. Denial of Medical Care

The plaintiff argues that the Officers violated her Fourteenth Amendment rights by denying her access to medical care during her pretrial detention, namely by hurting her shoulder while handcuffing her, handcuffing her too tightly, and failing to provide her medical treatment upon request at the police department holding cell.[27] Pl.'s Mem. at 14–16. "Failure to provide medical care to a person in custody can rise to the level of a constitutional violation under § 1983 only if that failure rises to the level of deliberate indifference to that person's serious medical needs." *Groman*, 47 F.3d at 636–37. If the individual is not a convicted prisoner, but merely in police custody (*i.e.*, a pretrial detainee), the right arises under the Fourteenth Amendment instead of the Eighth Amendment. *See Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 581–82 (3d Cir. 2003) (stating that claims about denial of medical care brought by pretrial detainees arise under Fourteenth Amendment). However, "the Fourteenth Amendment affords pretrial detainees

---

[27] The court notes that the Officers can be sued for deliberate indifference to medical needs for their own behavior. *See, e.g.*, *Williams v. City of Scranton*, Civ. A. No. 3:10-CV-388, 2013 WL 1339027, at *6 (M.D. Pa. Apr. 1, 2013), *aff'd*, 566 F. App'x 129 (3d Cir. 2014); *Sullivan v. Warminster Twp.*, 765 F. Supp. 2d 687, 702 (E.D. Pa. 2011) ("While the overwhelming majority of denial of medical treatment claims occur in the prison context, liability under § 1983 is not constrained solely to prisons that fail to provide inmates with required medical treatment."); *Dayton v. Sapp*, 668 F. Supp. 385, 388 (D. Del. 1987) ("The failure of police officers to provide adequate medical care to a prisoner rises to the level of unconstitutional conduct when there is a 'deliberate indifference to serious medical needs.'" (quoting *Estelle v. Gamble*, 429 U.S. 97 (1976)).

protections at least as great as the Eighth Amendment protections available to a convicted prisoner[.]" *Id.* at 581 (citation and internal quotation marks omitted). Because the rights are, at a minimum, the same under the Fourteenth and Eighth Amendments, "decisions interpreting the Eighth Amendment serve as 'useful analogies[]'" for cases arising under the Fourteenth Amendment. *Boring v. Kozakiewicz*, 833 F.2d 468, 472 (3d Cir. 1987) (quoting *Hampton v. Holmesburg Prison Officials*, 546 F.2d 1077, 1080 (3d Cir. 1976)); *see also Mattern v. City of Sea Isle*, 131 F. Supp. 3d 305, 314 (D.N.J. 2015) (reviewing Fourteenth Amendment "pre-incarceration detention and interrogation" denial of medical care claim "under the standard used to evaluate similar claims brought under the Eighth Amendment"), *aff'd*, 657 F. App'x 134 (3d Cir. 2016).

In the context of the Eighth Amendment, a plaintiff must

> [f]irst, . . . set forth evidence of an objectively serious medical need. *See Monmouth County Corr. Inst'l Inmates v. Lanzaro*, 834 F.2d 326, 346-47 (3d Cir. 1987). A medical need qualifies as "serious" for purposes of this analysis if, for example, "it is one that has been diagnosed by a physician as requiring treatment or is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Id.* . . . Second, a prison official is deliberately indifferent if he or she knows of and disregards an excessive risk to inmate health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Moreover, whether or not a defendant's conduct amounts to "deliberate indifference has been described as a classic issue for the fact finder." *See Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998) (cited by *A.M. ex. rel. J.M.K. v. Luzerne County Juvenile Det. Ctr.*, 372 F.3d 572, 588 (3d Cir. 2004)).

*Young v. Kazmerski*, 266 F. App'x 191, 193 (3d Cir. 2008) (per curiam).

With respect to an arrestee, "a police officer [must] . . . provide medical care to an individual who was injured during the course of an arrest when the need 'is so obvious that a reasonably trained officer would recognize the necessity for attention.'" *Bornstad ex rel. Estate of Bornstad v. Honey Brook Twp.*, No. C.A. 03-CV-3822, 2005 WL 2212359, at *19 (E.D. Pa.

Sept. 9, 2005), *aff'd sub nom.* 211 F. App'x 118 (3d Cir. 2007).[28]  Further, "[i]t is well-settled that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute 'deliberate indifference.'" *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). "Deliberate indifference, therefore, requires obduracy and wantonness, which has been likened to conduct that includes recklessness or a conscious disregard of a serious risk." *Id.* at 197 (internal citations and quotation marks omitted).  Examples of "deliberate indifference" in the prisoner context include: "where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Id.* at 198.

As to the first prong, whether the plaintiff suffers from a serious medical condition, courts have found certain obvious conditions, such as gunshot wounds, "serious medical conditions." *See, e.g.*, *Sullivan*, 2010 WL 2164520, at *4 (finding plaintiff who alleged police shot him and allowed him to die on floor stated claim for deliberate indifference to serious medical condition). Whereas other conditions such as "weight loss, eczema of the feet, seborrhea of the scalp, athlete's foot, constipation, and swollen knuckles" are not sufficiently obvious to a lay person to satisfy the first prong without a medical diagnosis. *Tsakonas v. Cicchi*, 308 F. App'x 628, 632 (3d Cir. 2009). Further, the mere fact that the plaintiff suffered injuries from an officer's use of typical detention tools which may cause pain, *e.g.*, pepper spray and handcuffs, does not automatically convert any injuries to "serious medical conditions." *See, e.g.*, *McCamey v. Craig*, Civ. A. No. 15-1108, 2016 WL 5816821, at *5 (W.D. Pa. Oct. 5, 2016) (finding no deliberate indifference to medical needs

---

[28] The court notes that a *post-hoc* diagnosis cannot be used to prove that the medical condition is "serious" because the diagnosis must occur "*before* the defendant's alleged deliberate indifference[.]" *Mattern*, 657 F. App'x at 139 (quoting *Burgess v. Fischer*, 735 F.3d 462, 477 (6th Cir. 2013) (emphasis in original)).

post-pepper spray because "[i]t is expected that there would be pain and discomfort after being exposed to pepper-spray. Moreover, simply alleging 'excruciating pain' is insufficient"), *appeal dismissed*, No. 16-4045, 2017 WL 5564562 (3d Cir. June 12, 2017); *Fielder v. Fornelli*, Civ. A. No. 09-881, 2011 WL 4527322, at *8 (W.D. Pa. Sept. 6, 2011) ("First, the use of restraints, inevitably causes some amount of discomfort or irritation and hence, their use, even if it causes a rash does not deprive the detainee of the 'minimal civilized measure of life's necessities' as is required to establish the objective prong of a deliberate indifference claim." (citations omitted)), *report and recommendation adopted*, 2011 WL 4527374 (W.D. Pa. Sept. 28, 2011); *Wade v. Colaner*, Civ. A. No. 06-cv-3715(FLW), 2009 WL 776985, at *11–12 (D.N.J. Mar. 20, 2009) (holding delay in providing medical care not deliberate indifference when officers pepper-sprayed plaintiff causing him to be in pain, but plaintiff did not suffer from severe complications due to spraying); *Dayton v. Sapp*, 668 F. Supp. 385, 389 (D. Del. 1987) (explaining that officer's conduct in believing plaintiff did not require medical care after being sprayed with mace could constitute "negligent response from a trained police officer . . . [h]owever, the standard is not negligence but 'deliberate indifference'").

Here, the court is unable to determine whether the plaintiff's protests during the handcuffing incident sufficiently notified the Officers to the severity of her medical conditions because the material facts surrounding the incident are disputed. While it is undisputed that the plaintiff complained of shoulder pain to Officers Madison and Hendricks, and that they did not provide her with medical care,[29] the extent to which the plaintiff informed the Officers of her

---

[29] Both Officers Hendricks and Madison testified during their depositions that the plaintiff stated that her shoulder hurt; however, none of the Officers sought to provide the plaintiff with medical care. *See* Madison Dep. at 135–36 ("But she was -- she did state -- that's when she said her shoulder hurt. So I let her brace herself off my arm. But she said she didn't want any help, that she would do it herself. And I insisted on helping her get out of the vehicle."); Hendricks Dep. at 82 ("Q. Do you remember her -- her saying that her -- her shoulder was hurting from what the police were doing? . . . A. I remember that she said later on that we hurt her shoulder. Q. When did she say that? A. I believe she said that in [the] cell block.").

previous injury and whether a lay person would understand the severity of her injury are disputed material facts.[30]  Therefore, these disputed issues of material fact precludes the court from granting summary judgment in favor of the defendants.[31]

      d.      <u>Fabrication of Evidence: Fourteenth Amendment Due Process</u>

The defendants move for summary judgment as to the plaintiff's claim under the Fourteenth Amendment for fabrication of evidence.  The defendants argue that her "fabrication of evidence claim" is merely a "false arrest claim" hidden by "creative pleading."  Defs. Br. at 19.  As a result, the defendants argue *Heck* bars the claim, because success on her fabrication of evidence claim necessarily implicates her underlying criminal charges.  Defs.' Br. at 21–22.  In response, the plaintiff argues that the court should deny summary judgment because the Third Circuit in *Halsey v. Pfeiffer*, 750 F.3d 273 (2014), recognized a standalone cause of action under the Fourteenth Amendment for fabrication of evidence claims.  Pl.'s Mem. at 16.  The plaintiff also argues that the Third Circuit does not consider *Heck* a bar to independent fabrication of evidence claims because *Halsey* held that fabrication of evidence claims are distinct from malicious prosecution claims.  *Id.*  The plaintiff argues that *Halsey*'s rule is dispositive because it "operates on the basis of a conviction."  *Id.* at 17.

---

[30] The Officers that were deposed (Officers Madison, Hendricks, and Glenny) all testified that during the arrest the plaintiff was screaming and yelling, but that they generally did not recall what she was "yelling" about.  *See generally* Madison Dep. at 124 ("No. She never said I hurt -- I'm hurting her.  But I don't recall anything about her -- I don't recall."); Hendricks Dep. at 90 ("Q. Do you recall her yelling the handcuffs were hurting her? A. No."); Glenny Dep. at 66 ("I heard her yelling.  But I -- I don't recall what she said.").  The plaintiff argues that those yells were for help and for the officers to be gentle because of her shoulder injury and/or she was in pain.  Klein Dep. at 142–43 ("Q. What were you yelling? A. That they were hurting me.").

[31] To the extent the plaintiff intends to argue at trial that the Officers are responsible for the police department's denial of medical care while she was in the holding cell because the plaintiff allegedly requested treatment for her stomach injury, this claim fails because the plaintiff does not state that the Officers knew of her request to the unnamed official, therefore, his/her conduct cannot be held to show the "state of mind" of the Officers.  *See Innis v. Wilson*, 334 F. App'x 454, 457 (3d Cir. 2009) (affirming dismissal of claims against maintenance supervisors because plaintiff failed to plead that they were "aware of a risk of serious injury that could occur and purposefully failed to take appropriate steps"); *Easterling v. Perez*, Civ. A. No. 16-4463 (JMV/MF), 2019 WL 316015, at *9 (D.N.J. Jan. 24, 2019) (granting summary judgment in favor of defendants who had no "personal involvement" in allegedly delaying treatment of plaintiff's serious medical needs).

In *Halsey*, the Third Circuit held

> that if a defendant has been convicted at a trial at which the prosecution has used fabricated evidence, the defendant has a stand-alone claim under section 1983 based on the Fourteenth Amendment if there is a reasonable likelihood that, without the use of that evidence, the defendant would not have been convicted.

*Halsey*, 750 F.3d at 294.[32]  "[A]n acquitted defendant can also bring such a claim if 'there is a reasonable likelihood that, absent that fabricated evidence, the defendant would not have been criminally charged.'"  *Boseman v. Upper Providence Twp.*, 680 F. App'x 65, 69 (3d Cir. 2017) (quoting *Black*, 750 F.3d at 371).  In creating this standalone claim, the Third Circuit cautioned:

> a civil plaintiff alleging that he had been convicted in a criminal prosecution in which the prosecutor used fabricated evidence should not be permitted to survive a motion for summary judgment or for judgment as a matter of law unless he can demonstrate that the record supports a conclusion that the allegedly fabricated evidence was so significant that it could have affected the outcome of the criminal case.  Moreover, testimony that is incorrect or simply disputed should not be treated as fabricated merely because it turns out to have been wrong.  Therefore, for example, a witness's misidentification should not be regarded as a fabrication in

---

[32] At the outset, the court notes that the plaintiff was neither convicted nor acquitted; instead, she participated in ARD. Whether an individual who was charged, but not convicted or acquitted, can bring a standalone Fourteenth Amendment fabrication of evidence claim is an open question in the Third Circuit. However, district courts in the Third Circuit that have previously addressed the issue have found that a conviction or acquittal is not required.  *See Castellani v. City of Atl. City*, Civil No. 13-5848 (JBS/AMD), 2017 WL 3112820, at *4, 10–11 (D.N.J. July 21, 2017) (denying summary judgment on fabrication of evidence claim under *Halsey* even though plaintiff participated in New Jersey's "Pretrial Intervention Program"); *see also Delade v. Cargan*, No. 3:16-CV-00415, 2019 WL 1387704, at *28 (M.D. Pa. Mar. 27, 2019) ("While the holdings in *Halsey* and *Black* [ *v. Montgomery County*, 835 F.3d 358 (3d Cir. 2016)] were limited to persons who had either been convicted or acquitted and who thereafter filed suit alleging that they were victims of prosecutions which were based upon fabricated evidence, the reasoning in both cases strongly suggests that the protections afforded by the substantive due process protections of the Fourteenth Amendment would apply as well at the pretrial detention phase . . . .").

The court agrees with the reading of *Black* described in *Castellani*, namely that "[t]here is no requirement under *Black* that the defendant in the criminal case (plaintiff here) must have faced trial." 2017 WL 3112820, at *11. Specifically, in *Black* the Third Circuit recognized that a conviction should not be a prerequisite to a fabrication of evidence claim because "[f]abricated evidence is an affront to due process of law, and state actors seeking to frame citizens undermine fundamental fairness and are responsible for 'corruption of the truth-seeking function of the trial process.'" 835 F.3d at 370 (quoting *United States v. Agurs*, 427 U.S. 97 (1976)). If the plaintiff's claims are true, she suffered the same harm, *i.e.*, the initiation of a criminal proceeding based on fabricated evidence. While she ultimately did not go to trial, she participated in ARD—a costly and time-consuming process—a process initiated because she was criminally charged. Because "[the Third Circuit's] reasoning in *Halsey* makes no distinction between fabricated evidence leading to a wrongful conviction and wrongful criminal charges . . . [and] repeatedly referred to the injury of falsified evidence leading to wrongful initiation of prosecution[,]" the court finds the plaintiff may bring this claim even though she participated in ARD and was not convicted or acquitted. *Black*, 835 F.3d at 370 (citation omitted).

the absence of persuasive evidence supporting a conclusion that the proponents of the evidence were aware that the identification was incorrect, and thus, in effect, offered the evidence in bad faith. Accordingly, we expect that it will be an unusual case in which a police officer cannot obtain a summary judgment in a civil action charging him with having fabricated evidence used in an earlier criminal case.

*Halsey*, 750 F.3d at 295 (citation and internal footnote omitted).

At the summary judgment stage, "a civil plaintiff's fabricated evidence claim should not survive summary judgment unless he can demonstrate that the fabricated evidence 'was so significant that it could have affected the outcome of the criminal case.'" *Black*, 835 F.3d at 372 (quoting *Halsey*, 750 F.3d at 295), *as amended* (Sept. 16, 2016). The Third Circuit has described this hurdle as "high." *See Boseman*, 680 F. App'x at 70 n.11 ("Maintaining a high bar for fabrication-of-evidence claims is essential[.]").

As to the defendants' argument that *Heck* bars this claim because it is actually a malicious prosecution claim, the defendants' argument is partially correct. As described above, the plaintiff may bring a standalone cause of action under the Fourteenth Amendment pursuant to *Halsey*; however, *Heck* can bar standalone fabrication of evidence claims. *See, e.g.*, *Ortiz v. N.J. State Police*, 747 F. App'x 73, 77 (3d Cir. 2018) (non-precedential) ("Ortiz's claims that the defendants fabricated and suppressed evidence are barred by *Heck* because success on those claims would necessarily imply the invalidity of her conviction."); *Webster v. Wojtowicz*, Civ. A. No. 13-1171 (ES), 2018 WL 4442220, at *3 (D.N.J. Sept. 17, 2018) ("Plaintiff's fabrication of evidence claim, for which the sole supporting factual allegation in the Complaint is that Defendants 'plant[ed] drug narcotics on [him],' is barred by *Heck*." (alterations in original) (footnote omitted)).

*Heck* bars section 1983 actions which implicate the validity of an underlying criminal conviction unless said conviction has been invalidated. *Heck*, 512 U.S. at 487. When such causes of action are brought under section 1983, *Heck* requires courts to determine

whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated. But if the district court determines that the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit.

*Id.* (footnotes omitted).

In practice, *Heck* requires a section 1983 plaintiff to have received a "favorable termination" before bringing claims which implicate their underlying criminal conviction (*e.g.*, false arrest, malicious prosecution). *Bronowicz v. Allegheny Cty.*, 804 F.3d 338, 344–46 (3d Cir. 2015). Pennsylvania's ARD program does not constitute a "favorable termination." *Gilles v. Davis*, 427 F.3d 197, 211–12 (3d Cir. 2005) (holding plaintiff's "participation in the ARD program bars his § 1983 claim[]").

In the present case, *Heck* bars the plaintiff's fabrication of evidence claim because (1) it implicates the validity of her criminal charges, and (2) she did not receive a favorable termination in her criminal proceeding. Under the first prong of *Heck*, her claim implicates the validity of her criminal charges because it seeks to establish that she was incorrectly charged based on fabricated evidence. *Ortiz*, 747 F. App'x at 77. Under the second prong of *Heck*, the plaintiff's claim also fails because she participated in ARD and ARD does not constitute a "favorable termination." *Gilles*, 427 F.3d at 211 [33] Therefore, the court dismisses without prejudice this claim.[34]

---

[33] The court also notes that the plaintiff has not established how the fabricated evidence impacted her criminal charges and generally fails to identify with specificity which evidence in the record is fabricated. *See Halsey*, 750 F.3d at 295.

[34] When a court disposes of a claim on the basis of *Heck*, even at the summary judgment stage, it should be a dismissal without prejudice. *See Schreane v. Marr*, 722 F. App'x 160, 166 (3d Cir. 2018) (per curiam) ("Claims that are barred by *Heck* and *Balisok* should be dismissed without prejudice to the plaintiff pursuing relief through the proper avenue—a habeas corpus petition. Here, the District Court granted summary judgment to defendants on all counts, including Schreane's procedural due process and First Amendment retaliation claims. Accordingly, we will modify the District Court's entry of summary judgment to a dismissal of Schreane's procedural due process and First Amendment retaliation claims without prejudice to a challenge to his loss of his good-time credits through the filing of a federal habeas corpus petition pursuant to 28 U.S.C. § 2241." (internal citation omitted)).

### 3.    Section 1983 Derivative Liability Claims

The plaintiff brings two *Monell* claims: (1) supervisory liability-policymaker liability against Chief Morris, in his individual capacity, and (2) municipal liability against the City. *See* Compl. at 43 (Count VII), 51 (VIII).[35]

### a.    Supervisory Liability

"Individual defendants who are policymakers may be liable under § 1983 if it is shown that such defendants, 'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm.'" *A.M. ex rel. J.M.K.*, 372 F.3d at 586 (quoting *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir. 1989)). Individual defendants may also be held liable under a supervisory liability theory if "he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *Id.* (citing *Baker v. Monroe Twp.*, 50 F.3d 1186, 1190–91 (3d Cir. 1995)).

The defendants ask the court to dismiss the official capacity claim against Chief Morris because it is duplicative of the plaintiff's claim against the City, Defs.' Br. at 37, however, the plaintiff's claim is brought against Chief Morris in his *individual* capacity. Compl. at 43. Unlike official capacity claims brought against policy-makers and supervisors, individual capacity claims are not duplicative of *Monell* claims against a locality. *A.M. ex rel. J.M.K.*, 372 F.3d at 586. Here, the plaintiff's only allegations against Chief Morris relate to his role as a policy-maker and not his

---

[35] The defendants address only an official capacity claim against Chief Morris, *see* Defs.' Br. at 28 ("Plaintiff names Keith Morris in his "official" capacity as the (former) Chief of the Allentown Police Department, former Mayor Edwin Pawlowski in his "official" capacity as the Mayor of the City of Allentown."); however, the plaintiff sued Chief Morris exclusively in his individual capacity. *See* Compl. at 43 ("Supervisory Liability-Policymaker Liability Against Defendants Pawlowski, Morris and Does, Individually"). To the extent the plaintiff raised an official capacity claim against Chief Morris, summary judgment is granted with respect to that claim because it is duplicative of the *Monell* claim against the City. *See Brandon v. Holt*, 469 U.S. 464, 471 (1985) ("[A] judgment against a public servant 'in his official capacity' imposes liability on the entity that he represents . . . .").

personal involvement or acquiescence in any alleged violations.  *See* Pl.'s Mem. at 30 ("Clearly, Chief Morris played an integral personal role in the policies, practices and customs which Plaintiff alleges, and the record and Dr. Peters' expert report details, were the moving force behind the Constitutional harms alleged here.").  The plaintiff may proceed on this claim because she has sufficiently produced record evidence from which a reasonable fact finder could determine that the police department's policies caused her constitutional violations and that Chief Morris was a policymaker.  Pl.'s Mem., Ex. 6, Defendants, Officer Stephen Madison, Officer Christopher Hendricks, Officer Michael Good, Officer Jacoby Glenny, Former Mayor Edwin Pawlowski, Former Chief Keith Morris, and the City of Allentown's Resps. and Objs. to Pl.'s First Set of Interrogs. at ECF p. 79 ("[T]he Chief of Police has ultimate responsibility for formulation and/or implementation of practices, policies and procedures, discipline and assignment of officers, hiring and firing, as well as the day-to-day operation, overseeing, command and control of all segments of the Allentown Police Department."), Doc. No. 58-3; *see A.M. ex rel. J.M.K.*, 372 F.3d at 586 (holding district court improperly granted summary judgment for defendant-policymakers in their individual capacities when evidence showed they helped create policies that potentially caused plaintiff's injuries).  Consequently, the court denies summary judgment with respect to the plaintiff's section 1983 claim against Chief Morris in his individual capacity.

b.     <u>Municipal Liability</u>

The defendants seek summary judgment on the plaintiff's *Monell* claim against the City because she allegedly failed to establish an underlying constitutional violation and, in the alternative, because the City's policies and practices did not constitute deliberate indifference that caused her harms.  Defs.' Br. at 29–36.  The plaintiff argues that she has produced sufficient evidence to survive summary judgment on her *Monell* claim, namely that her expert report shows

how the City has failed to train police officers to avoid the constitutional violations that she suffered and that she has identified a constitutionally deficient policy.  Pl.'s Mem. at 26–28.

Local governments can be held liable under section 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible for under § 1983."  *Monell*, 436 U.S. at 694.  "[A] plaintiff advancing a municipal liability claim must establish (a) 'a violation of a federal right'—which may not necessarily arise from the liability of an individual employee—and (b) a municipal policy or custom that caused the violation."  *Butler v. Lamont*, 672 F. App'x 139, 142 (3d Cir. 2016) (quoting *Berg v. Cty. of Allegheny*, 219 F.3d 261, 268–77 (3d Cir. 2000)).  "Policy is made when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict."  *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (alteration in original) (citation and internal quotation marks omitted).  Whereas custom "can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Id.* (citation and internal quotation marks omitted).

Here, the plaintiff produced an expert report in support of her claim that the City's policies are deficient.  *See* Pl.'s Mem., Ex. 5, Expert Op. Report: John G. Peters, Jr. ("Peters Rep.") at ECF pp. 43–72, Doc. No. 58-3.  As to the first prong of *Monell* liability, *i.e.*, a violation of an underlying constitutional or statutory right, for the reasons stated above, a reasonable jury could find the Officers violated the plaintiff's constitutional rights (excessive force and illegal search).  As to the second prong, whether municipal policies and/or practices caused these violations, the plaintiff has produced evidence of policies which she alleges are constitutionally deficient and presented

arguments, via expert, why those policies caused the violations she suffered. *See, e.g.*, *Halsey*, 750 F.3d at 309 ("In any event, here we cite the expert's report only to support the conclusion that there was a genuine dispute of material fact on the issue of whether the appellees obtained Halsey's signature on the confession through coercion." (citation omitted)); *Noble v. City of Camden*, 112 F. Supp. 3d 208, 224 (D.N.J. 2015) ("This Court has, in the past, found expert reports presenting similar evidence sufficient to deny summary judgment on *Monell* claims, and will do so today.").[36] The plaintiff's expert also provides opinions as to numerous deficiencies with the City's customs and policies. *See, e.g.*, Peters Rep. at 9 (stating City had "custom, practice, and/or policy of failing to develop and implement a surveillance system to identify and track use-of-force incidents by their officers"). As a result, the court denies summary judgment with respect to this claim.

### D. <u>State Law Claims</u>

The plaintiff brings several state law claims: assault and battery against Officers Madison, Hendricks, and Glenny (Count IX); state constitutional violations against the Officers (Count X); trespass against the Officers (Count XI); state civil conspiracy against the Officers (Count XII). Compl. at 60–64. As to the plaintiff's state law tort claims against certain individual Officers, the defendants argue (1) the defendants did not commit such torts because their actions are privileged and (2) the respective Officers are entitled to immunity under the Political Subdivision Tort Claims Act ("PSTCA"). The defendants also seek summary judgment as to the plaintiff's "claim" for punitive damages.[37] The court first addresses the plaintiff's tort claims against the individual defendants and then her state constitutional claim.

---

[36] The record also includes the City's Search and Seizure Policy and Arrest Procedures Policy along with the individual officers' training records. *See generally* Defs.' Facts, Ex. N, Doc. No. 56-14; Defs.' Facts, Ex. O, Doc. No. 56-15; Defs.' Facts, Ex. P, Doc. No. 56-16.

[37] Because "punitive damages" is not a claim, but rather a remedy, the court will defer ruling on this until after trial and the parties may re-raise this argument during the charge conference based on the evidence presented at trial.

### 1. State Law Torts: Assault, Battery, Civil Conspiracy, and Trespass

For each of the plaintiff's state law tort claims, the defendants assert Political Subdivision

Tort Claims Act ("PTSCA") immunity.[38]  Analogous to qualified immunity under federal law,

Pennsylvania law also immunizes certain governmental employee conduct, namely,

> [t]he Political Subdivision Tort Claims Act grants the City governmental immunity from liability for any damages resulting from an injury to a person or property caused by any act of the City, its employee, or any other person, except as specifically provided for under 42 Pa.C.S.A. § 8542.  This immunity extends to an employee of the City who is liable for civil damages caused by acts which are within the scope of his office or duties.  An employee may be indemnified for the payment of a judgment arising from a lawsuit when the employee was acting, or reasonably believed that he was acting, within the scope of his duties.  42 Pa.C.S.A. § 8548(a).  An employee's immunity does not extend to acts that are judicially determined to be crimes, actual fraud, actual malice, or willful misconduct. 42 Pa.C.S.A § 8550.

*Renk v. City of Pittsburgh*, 641 A.2d 289, 292 (Pa. 1994).

Aside from the exceptions for criminal activity, fraud, "actual malice, or willful conduct[,]"

there are eight enumerated exceptions to PTSCA immunity: (1) vehicle liability; (2) care, custody

or control of personal property; (3) real property; (4) trees, traffic control and street lighting; (5)

utility services facilities; (6) streets; (7) sidewalks; and (8) care, custody, or control of animals.  42

Pa. C.S. § 8542(b)(1)–(8).

#### a. Assault & Battery

The plaintiff argues that Officers Hendricks, Madison, and Glenny committed the state

torts of assault and battery during her arrest.  An assault constitutes "an intentional attempt by

force to do injury to the person of another and a battery is committed whenever the violence

---

[38] The plaintiff also argues that the defendants are not entitled to PTSCA immunity because she also seeks injunctive relief and PTSCA immunity provides immunity from suit solely for damages.  Pl.'s Mem. at 35.  As described below, the court is unable to determine whether the defendants are entitled to PTSCA immunity because such analysis hinges on disputed issues of material fact.  Therefore, the court declines to address this argument at the present time.

menaced in an assault is actually done, though in ever so small a degree, upon the person." *Renk*, 641 A.2d at 293 (citation and internal quotation marks omitted)). Police officers are privileged to use "reasonable force" to effectuate a lawful arrest. *See Pelzer v. City of Phila.*, 656 F. Supp. 2d 517, 539 (E.D. Pa. 2009) ("Similar to a Fourth Amendment claim, the officer's liability will hinge on the reasonableness of the force used." (citation omitted)); *Renk*, 641 A.2d at 293 ("A police officer may use reasonable force to prevent interference with the exercise of his authority or the performance of his duty.").

Here, for the reasons stated above with respect to the plaintiff's excessive force claim, the material factual disputes preclude summary judgment as to whether the Officers applied reasonable force during her arrest. Because the court cannot determine whether such force was reasonable, without accepting disputed facts, the court is also precluded from determining whether the Officers are entitled to summary judgment because their actions were not "willful" pursuant to the PTSCA. *Cf. Rodriguez v. Panarello*, 119 F. Supp. 3d 331, 345 (E.D. Pa. 2015) (finding officer immune from assault claim under PSTCA because the "conclusion that the use of force was objectively reasonable is also dispositive of the issue of willful misconduct[]"). Thus, the court denies the defendants' request for summary judgment as to these claims.

b.    Trespass

Under Pennsylvania law, "'[o]ne who intentionally enters land in the possession of another without a privilege to do so is liable'" for trespass. *Kopka v. Bell Tel. Co. of Pa.*, 91 A.2d 232, 235 (Pa. 1952) (quoting Restatement of Torts § 163); *see also Woodham v. Dubas*, 256 F. App'x 571, 576 (3d Cir. 2007) (per curiam) (holding jury's determination that officer entered property with permission precluded trespass verdict). If a law enforcement officer lawfully enters private property because the entry is privileged (*i.e.*, the officer has a warrant, exigent circumstances

justify warrantless entry, the officer has the owner's consent), the officer is not liable for trespass. *See Dorkoski v. Pensyl*, Civ. A. No. 4:05-0705, 2007 WL 775602, at *9 (M.D. Pa. Mar. 9, 2007) ("To the extent that the court has found that exigent circumstances justified the defendants' entry into the plaintiff's property, the defendants' entry was not unprivileged and the plaintiff's state law claim fails."). Here, for the reasons stated above, a reasonable jury could find the Officers' entry into the Residence was not privileged. The court defers analysis of PTSCA immunity for her trespass claim because whether the Officers' entry was willful misconduct hinges on disputed issues of material fact, namely the motivations of the individual Officers. Hence, the court denies the defendants' request for summary judgment on this claim as well.

### c. Civil Conspiracy

The plaintiff also brings a claim for state law civil conspiracy based on the same grounds as her section 1983 civil conspiracy claim. *See* Pl.'s Mem. at 35 ("For the reasons set forth in the civil conspiracy / federal claims discussed above, the motion for summary judgment must be denied."). Under Pennsylvania law,

> [i]n order to state a cause of action for civil conspiracy, a plaintiff must show "that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means. Proof of malice, i.e., an intent to injure, is essential in proof of a conspiracy." *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 211, 412 A.2d 466, 472 (1979) (citations omitted).

*Skipworth by Williams v. Lead Indus. Ass'n, Inc.*, 690 A.2d 169, 174 (Pa. 1997).

Here, as discussed above, while the plaintiff presents a weak claim for civil conspiracy, disputed issues of material fact prevent the court from granting summary judgment in favor of the defendants at this time. Therefore, the court denies the request for summary judgment on the plaintiff's state law civil conspiracy claim.

## 2.    Violation of the Pennsylvania Constitution Claim

The defendants argue that they are entitled to summary judgment on the plaintiff's state constitutional law claim because there is no private right of action under the state constitution for monetary damages.  Defs.' Br. at 39.  The plaintiff argues in response that, to the extent she seeks non-monetary relief, the court should deny summary judgment.  Pl.'s Mem. at 33–34.

"No Pennsylvania statute establishes, and no Pennsylvania court has recognized, a private cause of action for damages under the Pennsylvania Constitution."  *Pocono Mountain Charter Sch. v. Pocono Mountain Sch. Dist.*, 442 F. App'x 681, 687 (3d Cir. 2011) (citing *Jones v. City of Phila.*, 890 A.2d 1188, 1208 (Pa. Commw. 2006)).  While parties may not seek monetary damages for violations of the Pennsylvania Constitution, "equitable remedies are available."  *Id.*

Here, the plaintiff alleges that the defendants violated her rights under Article 1, Section 1,[39] Article 1, Section 8,[40] and Article 1, Section 9[41] of the Pennsylvania Constitution.  Compl. at ¶ 210.  The plaintiff seeks "injunctive relief – prohibiting the Defendants from their continued engagement in the acts complained of herein" and alleges that she "believes and therefore alleges that she is at continuing risk to suffering identical harms by these Defendants in the event that court intervention does not occur and/or an appropriate permanent injunction is not entered." Compl. at ¶¶ 212–13.  To the extent the plaintiff seeks monetary damages, the court grants

---

[39] Pa. Const. art. I, § 1 ("All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.").

[40] Pa. Const. art. I, § 8 ("The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.").

[41] Pa. Const. art. I, § 9 ("In all criminal prosecutions the accused hath a right to be heard by himself and his counsel, to demand the nature and cause of the accusation against him, to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and, in prosecutions by indictment or information, a speedy public trial by an impartial jury of the vicinage; he cannot be compelled to give evidence against himself, nor can he be deprived of his life, liberty or property, unless by the judgment of his peers or the law of the land. The use of a suppressed voluntary admission or voluntary confession to impeach the credibility of a person may be permitted and shall not be construed as compelling a person to give evidence against himself.").

summary judgment with respect to this claim.  As to the plaintiffs' demand for injunctive relief, the court denies summary judgment.

### III.    CONCLUSION

For the reasons stated above, the court denies the defendants' motion for summary judgment as to the plaintiff's (1) section 1983 claims for (a) excessive force, (b) illegal search, (c) failure to intervene, (d) civil conspiracy, and (e) denial of medical care against the Officers; (2) section 1983 derivative liability claims against Chief Morris and the City; (3) state law claims against the individual Officers (*i.e.*, assault and battery, trespass, civil conspiracy) and her claim for injunctive relief under the Pennsylvania Constitution.  The court will (1) dismiss without prejudice the plaintiff's Fourteenth Amendment due process claim based on fabrication of evidence because *Heck* bars this claim and (2) grant summary judgment as to the plaintiff's claim for monetary damages under the Pennsylvania Constitution.  The parties may re-raise the following arguments at trial: qualified immunity on excessive force, PTSCA immunity as to the plaintiff's state law tort claims, and the plaintiff's request for a punitive damages instruction.

A separate order follows.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.